ANKENBRANDT, AS NEXT FRIEND AND MOTHER OF
L. R., ET AL. *v.* RICHARDS ET AL.

No. 91–367.   Argued March 31, 1992—Decided June 15, 1992

690

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACK-MUN, J., filed an opinion concurring in the judgment, *post*, p. 707. STE-VENS, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 717.

*Richard Ducote* argued the cause and filed a brief for petitioner.

*Paul Weidenfeld* argued the cause for respondents. With him on the brief was *Samuel S. Dalton.**

JUSTICE WHITE delivered the opinion of the Court.

This case presents the issue whether the federal courts have jurisdiction or should abstain in a case involving alleged torts committed by the former husband of petitioner and his female companion against petitioner's children, when the sole basis for federal jurisdiction is the diversity-of-citizenship provision of 28 U. S. C. § 1332.

## I

Petitioner Carol Ankenbrandt, a citizen of Missouri, brought this lawsuit on September 26, 1989, on behalf of her daughters L. R. and S. R. against respondents Jon A. Richards and Debra Kesler, citizens of Louisiana, in the United States District Court for the Eastern District of Louisiana. Alleging federal jurisdiction based on the diversity-of-citizenship provision of § 1332, Ankenbrandt's complaint sought monetary damages for alleged sexual and physical abuse of the children committed by Richards and Kesler. Richards is the divorced father of the children and Kesler his female companion.[1] On December 10, 1990, the District Court granted respondents' motion to dismiss this lawsuit.

---

*Marcia Robinson Lowry, Steven R. Shapiro,* and *John A. Powell* filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

[1] Ankenbrandt represents that in the month prior to the filing of this federal-court action, on August 9, 1989, a juvenile court in Jefferson Parish, Louisiana, entered a judgment under the State's child protection laws, La. Rev. Stat. Ann. § 13:1600 *et seq.* (West 1983), repealed, 1991 La. Acts, No. 235, § 17, eff. Jan. 1, 1992, and superseded by Louisiana Children's Code, Title X, Art. 1001 *et seq.* (1991), permanently terminating all of Richards' parental rights because of the alleged abuse and permanently enjoining him from any contact with the children. Neither the District Court nor the Court of Appeals found it necessary to pass on the accuracy of this representation in resolving the issues presented; nor do we.

Citing *In re Burrus*, 136 U. S. 586, 593–594 (1890), for the proposition that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States," the court concluded that this case fell within what has become known as the "domestic relations" exception to diversity jurisdiction, and that it lacked jurisdiction over the case. The court also invoked the abstention principles announced in *Younger* v. *Harris*, 401 U. S. 37 (1971), to justify its decision to dismiss the complaint without prejudice. No. 89–4244 (ED La., Dec. 10, 1990). The Court of Appeals affirmed in an unpublished opinion. No. 91–3037 (CA5, May 31, 1991), judgt. order reported at 934 F. 2d 1262.

We granted certiorari limited to the following questions: "(1) Is there a domestic relations exception to federal jurisdiction? (2) If so, does it permit a district court to abstain from exercising diversity jurisdiction over a tort action for damages?"[2] and "(3) Did the District Court in this case err in abstaining from exercising jurisdiction under the doctrine

---

[2] The Courts of Appeals have generally diverged in cases involving application of the domestic relations exception to tort suits brought in federal court pursuant to diversity jurisdiction. See, *e. g., Bennett* v. *Bennett*, 221 U. S. App. D. C. 90, 682 F. 2d 1039 (1982) (holding that the exception does not bar a claim for damages but that it does bar claims for injunctive relief); *Cole* v. *Cole*, 633 F. 2d 1083 (CA4 1980) (holding that the exception does not apply in tort suits stemming from custody and visitation disputes); *Drewes* v. *Ilnicki*, 863 F. 2d 469 (CA6 1988) (holding that the exception does not apply to a tort suit for intentional infliction of emotional distress); *Lloyd* v. *Loeffler*, 694 F. 2d 489 (CA7 1982) (holding that the exception does not apply to a tort claim for interference with the custody of a child); *McIntyre* v. *McIntyre*, 771 F. 2d 1316 (CA9 1985) (holding that the exception does not apply when the case does not involve questions of parental status, interference with pending state domestic relations proceedings, an alteration of a state-court judgment, or the impingement of the state court's supervision of a minor); *Ingram* v. *Hayes*, 866 F. 2d 368 (CA11 1988) (holding that the exception applies to divest a federal court of jurisdiction over a tort action for intentional infliction of emotional distress).

of *Younger* v. *Harris?"* 502 U. S. 1023 (1992). We address each of these issues in turn.

## II

The domestic relations exception upon which the courts below relied to decline jurisdiction has been invoked often by the lower federal courts. The seeming authority for doing so originally stemmed from the announcement in *Barber* v. *Barber*, 21 How. 582 (1859), that the federal courts have no jurisdiction over suits for divorce or the allowance of alimony. In that case, the Court heard a suit in equity brought by a wife (by her next friend) in Federal District Court pursuant to diversity jurisdiction against her former husband. She sought to enforce a decree from a New York state court, which had granted a divorce and awarded her alimony. The former husband thereupon moved to Wisconsin to place himself beyond the New York courts' jurisdiction so that the divorce decree there could not be enforced against him; he then sued for divorce in a Wisconsin court, representing to that court that his wife had abandoned him and failing to disclose the existence of the New York decree. In a suit brought by the former wife in Wisconsin Federal District Court, the former husband alleged that the court lacked jurisdiction. The court accepted jurisdiction and gave judgment for the divorced wife.

On appeal, it was argued that the District Court lacked jurisdiction on two grounds: first, that there was no diversity of citizenship because although divorced, the wife's citizenship necessarily remained that of her former husband; and second, that the whole subject of divorce and alimony, including a suit to enforce an alimony decree, was exclusively ecclesiastical at the time of the adoption of the Constitution and that the Constitution therefore placed the whole subject of divorce and alimony beyond the jurisdiction of the United States courts. Over the dissent of three Justices, the Court rejected both arguments. After an exhaustive survey of

the authorities, the Court concluded that a divorced wife could acquire a citizenship separate from that of her former husband and that a suit to enforce an alimony decree rested within the federal courts' equity jurisdiction. The Court reached these conclusions after summarily dismissing the former husband's contention that the case involved a subject matter outside the federal courts' jurisdiction. In so stating, however, the Court also announced the following limitation on federal jurisdiction:

> "Our first remark is—and we wish it to be remembered—that this is not a suit asking the court for the allowance of alimony. That has been done by a court of competent jurisdiction. The court in Wisconsin was asked to interfere to prevent that decree from being defeated by fraud.
>
> "We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony, either as an original proceeding in chancery or as an incident to divorce a vinculo, or to one from bed and board." Barber, supra, at 584.

As a general matter, the dissenters agreed with these statements, but took issue with the Court's holding that the instant action to enforce an alimony decree was within the equity jurisdiction of the federal courts.

The statements disclaiming jurisdiction over divorce and alimony decree suits, though technically dicta, formed the basis for excluding "domestic relations" cases from the jurisdiction of the lower federal courts, a jurisdictional limitation those courts have recognized ever since. The Barber Court, however, cited no authority and did not discuss the foundation for its announcement. Since that time, the Court has dealt only occasionally with the domestic relations limitation on federal-court jurisdiction, and it has never addressed the basis for such a limitation. Because we are unwilling to cast aside an understood rule that has been recognized for nearly

a century and a half, we feel compelled to explain why we will continue to recognize this limitation on federal jurisdiction.

A

Counsel argued in *Barber* that the Constitution prohibited federal courts from exercising jurisdiction over domestic relations cases. Brief for Appellant in *Barber* v. *Barber*, D. T. 1858, No. 44, pp. 4–5. An examination of Article III, *Barber* itself, and our cases since *Barber* makes clear that the Constitution does not exclude domestic relations cases from the jurisdiction otherwise granted by statute to the federal courts.

Article III, § 2, of the Constitution provides in pertinent part:

> "Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Land under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

This section delineates the absolute limits on the federal courts' jurisdiction. But in articulating three different terms to define jurisdiction—"Cases, in Law and Equity," "Cases," and "Controversies"—this provision contains no limitation on subjects of a domestic relations nature. Nor did *Barber* purport to ground the domestic relations exception in these constitutional limits on federal jurisdiction. The Court's discussion of federal judicial power to hear suits

of a domestic relations nature contains no mention of the Constitution, see *Barber,* 21 How., at 584, and it is logical to presume that the Court based its statement limiting such power on narrower statutory, rather than broader constitutional, grounds. Cf. *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council,* 485 U. S. 568, 575 (1988).

Subsequent decisions confirm that *Barber* was not relying on constitutional limits in justifying the exception. In one such case, for instance, the Court stated the "long established rule" that federal courts lack jurisdiction over certain domestic relations matters as having been based on the assumptions that "husband and wife cannot usually be citizens of different States, so long as the marriage relation continues (a rule which has been somewhat relaxed in recent cases), and for the further reason that a suit for divorce in itself involves no pecuniary value." *De la Rama* v. *De la Rama,* 201 U. S. 303, 307 (1906). Since Article III contains no monetary limit on suits brought pursuant to federal diversity jurisdiction, *De la Rama*'s articulation of the "rule" in terms of the statutory requirements for diversity jurisdiction further supports the view that the exception is not grounded in the Constitution.

Moreover, even while citing with approval the *Barber* language purporting to limit the jurisdiction of the federal courts over domestic relations matters, the Court has heard appeals from territorial courts involving divorce, see, *e. g., De la Rama, supra; Simms* v. *Simms,* 175 U. S. 162 (1899), and has upheld the exercise of original jurisdiction by federal courts in the District of Columbia to decide divorce actions, see, *e. g., Glidden Co.* v. *Zdanok,* 370 U. S. 530, 581, n. 54 (1962). Thus, even were the statements in *De la Rama* referring to the statutory prerequisites of diversity jurisdiction alone not persuasive testament to the statutory origins of the rule, by hearing appeals from legislative, or Article I, courts, this Court implicitly has made clear its understanding

that the source of the constraint on jurisdiction from *Barber* was *not* Article III; otherwise the Court itself would have lacked jurisdiction over appeals from these legislative courts. See *National Mut. Ins. Co.* v. *Tidewater Transfer Co.*, 337 U. S. 582, 643 (1949) (Vinson, C. J., dissenting) ("We can no more review a legislative court's decision of a case which is not among those enumerated in Art. III than we can hear a case from a state court involving purely state law questions"). We therefore have no difficulty concluding that when the *Barber* Court "disclaim[ed] altogether any jurisdiction in the courts of the United States upon the subject of divorce," 21 How., at 584, it was not basing its statement on the Constitution.[3]

## B

That Article III, § 2, does not mandate the exclusion of domestic relations cases from federal-court jurisdiction, however, does not mean that such courts necessarily must retain and exercise jurisdiction over such cases. Other constitutional provisions explain why this is so. Article I, § 8, cl. 9, for example, authorizes Congress "[t]o constitute Tribunals inferior to the supreme Court" and Article III, § 1, states that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." The Court's cases state the rule that "if inferior federal courts were created, [Congress was not] required to invest them with all the jurisdiction it was authorized to bestow under Art. III." *Palmore* v. *United States*, 411 U. S. 389, 401 (1973).

---

[3] We read *Ohio ex rel. Popovici* v. *Agler*, 280 U. S. 379 (1930), as in accord with this conclusion. In that case, the Court referenced the language in *In re Burrus*, 136 U. S. 586 (1890), regarding the domestic relations exception and then held that a state court was not precluded by the Constitution and relevant federal statutes from exercising jurisdiction over a divorce suit brought against the Roumanian vice-consul. See 280 U. S., at 383–384.

This position has held constant since at least 1845, when the Court stated that "the judicial power of the United States . . . is (except in enumerated instances, applicable exclusively to this Court) dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress, who possess the sole power of creating the tribunals (inferior to the Supreme Court) . . . and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good." *Cary* v. *Curtis,* 3 How. 236, 245. See *Sheldon* v. *Sill,* 8 How. 441 (1850); *Plaquemines Tropical Fruit Co.* v. *Henderson,* 170 U. S. 511 (1898); *Kline* v. *Burke Constr. Co.,* 260 U. S. 226 (1922); *Lockerty* v. *Phillips,* 319 U. S. 182 (1943). We thus turn our attention to the relevant jurisdictional statutes.

The Judiciary Act of 1789 provided that "the circuit courts shall have original cognizance, concurrent with the courts of the several States, of *all suits of a civil nature at common law or in equity, where the matter in dispute exceeds,* exclusive of costs, the sum or value of *five hundred dollars,* and . . . an alien is a party, or the suit is *between a citizen of the State where the suit is brought, and a citizen of another State.*" Act of Sept. 24, 1789, § 11, 1 Stat. 78 (emphasis added). The defining phrase, "all suits of a civil nature at common law or in equity," remained a key element of statutory provisions demarcating the terms of diversity jurisdiction until 1948, when Congress amended the diversity jurisdiction provision to eliminate this phrase and replace in its stead the term "all civil actions." 1948 Judicial Code and Judiciary Act, 62 Stat. 930, 28 U. S. C. § 1332.

The *Barber* majority itself did not expressly refer to the diversity statute's use of the limitation on "suits of a civil nature at common law or in equity." The dissenters in *Barber,* however, implicitly made such a reference, for they suggested that the federal courts had no power over certain

domestic relations actions because the court of chancery lacked authority to issue divorce and alimony decrees. Stating that "[t]he origin and the extent of [the federal courts'] jurisdiction must be sought in the laws of the United States, and in the settled rules and principles by which those laws have bound them," the dissenters contended that "as the jurisdiction of the chancery in England does not extend to or embrace the subjects of divorce and alimony, and as the jurisdiction of the courts of the United States in chancery is bounded by that of the chancery in England, all power or cognizance with respect to those subjects by the courts of the United States *in chancery* is equally excluded." *Barber*, 21 How., at 605 (Daniel, J., dissenting). Hence, in the dissenters' view, a suit seeking such relief would not fall within the statutory language "all suits of a civil nature at common law or in equity." Because the *Barber* Court did not disagree with this reason for accepting the jurisdictional limitation over the issuance of divorce and alimony decrees, it may be inferred fairly that the jurisdictional limitation recognized by the Court rested on this statutory basis and that the disagreement between the Court and the dissenters thus centered only on the extent of the limitation.

We have no occasion here to join the historical debate over whether the English court of chancery had jurisdiction to handle certain domestic relations matters, though we note that commentators have found some support for the *Barber* majority's interpretation.[4] Certainly it was not unprecedented at the time for the Court to infer, from what it under-

---

[4] See, *e. g.*, Vestal & Foster, Implied Limitations on the Diversity Jurisdiction of Federal Courts, 41 Minn. L. Rev. 1, 28 (1956); Atwood, Domestic Relations Cases in Federal Court: Toward a Principled Exercise of Jurisdiction, 35 Hastings L. J. 571, 584–589 (1984); Rush, Domestic Relations Law: Federal Jurisdiction and State Sovereignty in Perspective, 60 Notre Dame L. Rev. 1, 15. (1984); Note, The Domestic Relations Exception to Diversity Jurisdiction, 83 Colum. L. Rev. 1824, 1834–1839 (1983); Note, The Domestic Relations Exception to Diversity Jurisdiction: A Re-Evaluation, 24 Boston College L. Rev. 661, 664–668 (1983).

stood to be English chancery practice, some guide to the meaning of the 1789 Act's jurisdictional grant. See, *e. g.,* *Robinson* v. *Campbell,* 3 Wheat. 212, 221–222 (1818). We thus are content to rest our conclusion that a domestic relations exception exists as a matter of statutory construction not on the accuracy of the historical justifications on which it was seemingly based, but rather on Congress' apparent acceptance of this construction of the diversity jurisdiction provisions in the years prior to 1948, when the statute limited jurisdiction to "suits of a civil nature at common law or in equity." As the court in *Phillips, Nizer, Benjamin, Krim & Ballon* v. *Rosenstiel,* 490 F. 2d 509, 514 (CA2 1973), observed: "More than a century has elapsed since the *Barber* dictum without any intimation of Congressional dissatisfaction. . . . Whatever Article III may or may not permit, we thus accept the *Barber* dictum as a correct interpretation of the Congressional grant." Considerations of *stare decisis* have particular strength in this context, where "the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 172–173 (1989).

When Congress amended the diversity statute in 1948 to replace the law/equity distinction with the phrase "all civil actions," we presume Congress did so with full cognizance of the Court's nearly century-long interpretation of the prior statutes, which had construed the statutory diversity jurisdiction to contain an exception for certain domestic relations matters. With respect to the 1948 amendment, the Court has previously stated that "no changes of law or policy are to be presumed from changes of language in the revision unless an intent to make such changes is clearly expressed." *Fourco Glass Co.* v. *Transmirra Products Corp.,* 353 U. S. 222, 227 (1957); see also *Finley* v. *United States,* 490 U. S. 545, 554 (1989). With respect to such a longstanding and well-known construction of the diversity statute, and where Congress made substantive changes to the statute in other

respects, see 28 U. S. C. § 1332 note, we presume, absent any indication that Congress intended to alter this exception, see *ibid.;* Advisory Committee's Note 3 to Fed. Rule Civ. Proc. 2, 28 U. S. C. App., p. 555, that Congress "adopt[ed] that interpretation" when it reenacted the diversity statute. *Lorillard* v. *Pons,* 434 U. S. 575, 580 (1978).[5]

## III

In the more than 100 years since this Court laid the seeds for the development of the domestic relations exception, the lower federal courts have applied it in a variety of circumstances. See, *e. g.,* cases cited in n. 1, *supra.* Many of these applications go well beyond the circumscribed situations posed by *Barber* and its progeny. *Barber* itself disclaimed federal jurisdiction over a narrow range of domestic relations issues involving the granting of a divorce and a decree of alimony, see 21 How., at 584, and stated the limits on federal-court power to intervene prior to the rendering of such orders:

> "It is, that when a court of competent jurisdiction over the subject-matter and the parties decrees a divorce, and alimony to the wife as its incident, and is unable of itself to enforce the decree summarily upon the husband, that courts of equity will interfere to prevent the decree from being defeated by fraud. The interference, however, is limited to cases in which alimony has been decreed; then only to the extent of what is due, and always to cases in which no appeal is pending from the decree for the divorce or for alimony." *Id.,* at 591.

The *Barber* Court thus did not intend to strip the federal courts of authority to hear cases arising from the domestic

---

[5] JUSTICE BLACKMUN criticizes us for resting upon Congress' apparent acceptance of the Court's earlier construction of the diversity statute in the 1948 codification. See *post,* at 708–709 (opinion concurring in judgment). We see nothing remarkable in this decision. See, *e. g., Flood* v. *Kuhn,* 407 U. S. 258, 283–284 (1972).

relations of persons unless they seek the granting or modification of a divorce or alimony decree. The holding of the case itself sanctioned the exercise of federal jurisdiction over the enforcement of an alimony decree that had been properly obtained in a state court of competent jurisdiction. Contrary to the *Barber* dissenters' position, the enforcement of such validly obtained orders does not "regulate the domestic relations of society" and produce an "inquisitorial authority" in which federal tribunals "enter the habitations and even into the chambers and nurseries of private families, and inquire into and pronounce upon the morals and habits and affections or antipathies of the members of every household." *Id.*, at 602 (Daniel, J., dissenting). And from the conclusion that the federal courts lacked jurisdiction to issue divorce and alimony decrees, there was no dissent. See *id.*, at 604 (Daniel, J., dissenting) (noting that "[u]pon questions of settlement or of contract connected with marriages, the court of chancery will undertake the enforcement of such contracts, but does not decree alimony as such, and independently of such contracts"). See also *Simms* v. *Simms,* 175 U. S., at 167 (stating that "[i]t may therefore be assumed as indubitable that the Circuit Courts of the United States have no jurisdiction, either of suits for divorce, or of claims for alimony, whether made in a suit for divorce, or by an original proceeding in equity, before a decree for such alimony in a state court").

Subsequently, this Court expanded the domestic relations exception to include decrees in child custody cases. In a child custody case brought pursuant to a writ of habeas corpus, for instance, the Court held void a writ issued by a Federal District Court to restore a child to the custody of the father. "As to the right to the control and possession of this child, as it is contested by its father and its grandfather, it is one in regard to which neither the Congress of the United States nor any authority of the United States has any special jurisdiction." *In re Burrus,* 136 U. S., at 594.

Although *In re Burrus* technically did not involve a construction of the diversity statute, as we understand *Barber* to have done, its statement that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States," *id.*, at 593–594, has been interpreted by the federal courts to apply with equal vigor in suits brought pursuant to diversity jurisdiction. See, *e. g., Bennett* v. *Bennett,* 221 U. S. App. D. C. 90, 93, 682 F. 2d 1039, 1042 (1982); *Solomon* v. *Solomon,* 516 F. 2d 1018, 1025 (CA3 1975); *Hernstadt* v. *Hernstadt,* 373 F. 2d 316, 317 (CA2 1967); see generally 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3609, pp. 477–479, nn. 28–32 (1984). This application is consistent with *Barber*'s directive to limit federal courts' exercise of diversity jurisdiction over suits for divorce and alimony decrees. See *Barber,* 21 How., at 584.[6] We conclude, therefore, that the domestic relations exception, as articulated by this Court since *Barber,* divests the federal courts of power to issue divorce, alimony, and child custody decrees. Given the long passage of time without any expression of congressional dissatisfaction, we have no trouble today reaffirming the validity of the exception as it pertains to divorce and alimony decrees and child custody orders.

Not only is our conclusion rooted in respect for this long-held understanding, it is also supported by sound policy considerations. Issuance of decrees of this type not infrequently involves retention of jurisdiction by the court and

---

[6] The better reasoned views among the Courts of Appeals have similarly stated the domestic relations exception as narrowly confined to suits for divorce, alimony, or child custody decrees. See, *e. g., McIntyre* v. *McIntyre,* 771 F. 2d, at 1317 (opinion of Kennedy, J.) ("[T]he exception to jurisdiction arises in those cases where a federal court is asked to grant a decree of divorce or annulment, or to grant custody or fix payments for support"); *Lloyd* v. *Loeffler,* 694 F. 2d, at 492 (same); *Bennett* v. *Bennett,* 221 U. S. App. D. C., at 93, 682 F. 2d, at 1042 (same); *Cole* v. *Cole,* 633 F. 2d, at 1087 (same).

deployment of social workers to monitor compliance. As a matter of judicial economy, state courts are more eminently suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling issues that arise out of conflicts over divorce, alimony, and child custody decrees. Moreover, as a matter of judicial expertise, it makes far more sense to retain the rule that federal courts lack power to issue these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees. See *Lloyd* v. *Loeffler*, 694 F. 2d 489, 492 (CA7 1982).

By concluding, as we do, that the domestic relations exception encompasses only cases involving the issuance of a divorce, alimony, or child custody decree, we necessarily find that the Court of Appeals erred by affirming the District Court's invocation of this exception. This lawsuit in no way seeks such a decree; rather, it alleges that respondents Richards and Kesler committed torts against L. R. and S. R., Ankenbrandt's children by Richards. Federal subject-matter jurisdiction pursuant to § 1332 thus is proper in this case.[7] We now address whether, even though subject-matter jurisdiction might be proper, sufficient grounds exist to warrant abstention from the exercise of that jurisdiction.

## IV

The Court of Appeals, as did the District Court, stated abstention as an alternative ground for its holding. The District Court quoted another federal court to the effect that "'[a]bstention, that doctrine designed to promote federal-state comity, is required when to render a decision would

---

[7] The courts below offered no explanation, and we are aware of none, why the domestic relations exception applies at all to respondent Kesler, who would appear to stand in the same position with respect to Ankenbrandt as any other opponent in a tort suit brought in federal court pursuant to diversity jurisdiction.

disrupt the establishment of a coherent state policy.'" App. to Pet. for Cert. A–6 (quoting *Zaubi* v. *Hoejme,* 530 F. Supp. 831, 836 (WD Pa. 1980)). It is axiomatic, however, that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist.* v. *United States,* 424 U. S. 800, 813 (1976). Abstention rarely should be invoked, because the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Id.,* at 817.

The courts below cited *Younger* v. *Harris,* 401 U. S. 37 (1971), to support their holdings to abstain in this case. In so doing, the courts clearly erred. *Younger* itself held that, absent unusual circumstances, a federal court could not interfere with a pending state criminal prosecution. *Id.,* at 54. Though we have extended *Younger* abstention to the civil context, see, *e. g., Middlesex County Ethics Comm.* v. *Garden State Bar Assn.,* 457 U. S. 423 (1982); *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.,* 477 U. S. 619 (1986); *Pennzoil Co.* v. *Texaco Inc.,* 481 U. S. 1 (1987), we have never applied the notions of comity so critical to *Younger's* "Our Federalism" when no state proceeding was pending nor any assertion of important state interests made. In this case, there is no allegation by respondents of any pending state proceedings, and Ankenbrandt contends that such proceedings ended prior to her filing this lawsuit. Absent any *pending* proceeding in state tribunals, therefore, application by the lower courts of *Younger* abstention was clearly erroneous.

It is not inconceivable, however, that in certain circumstances, the abstention principles developed in *Burford* v. *Sun Oil Co.,* 319 U. S. 315 (1943), might be relevant in a case involving elements of the domestic relationship even when the parties do not seek divorce, alimony, or child custody. This would be so when a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case

then at bar." *Colorado River Water Conservation Dist.,* *supra,* at 814. Such might well be the case if a federal suit were filed prior to effectuation of a divorce, alimony, or child custody decree, and the suit depended on a determination of the status of the parties. Where, as here, the status of the domestic relationship has been determined as a matter of state law, and in any event has no bearing on the underlying torts alleged, we have no difficulty concluding that *Burford* abstention is inappropriate in this case.[8]

## V

We thus conclude that the Court of Appeals erred by affirming the District Court's rulings to decline jurisdiction based on the domestic relations exception to diversity jurisdiction and to abstain under the doctrine of *Younger* v. *Harris, supra.* The exception has no place in a suit such as this one, in which a former spouse sues another on behalf of children alleged to have been abused. Because the allegations in this complaint do not request the District Court to issue a divorce, alimony, or child custody decree, we hold that the

---

[8] Moreover, should *Burford* abstention be relevant in other circumstances, it may be appropriate for the court to retain jurisdiction to ensure prompt and just disposition of the matter upon the determination by the state court of the relevant issue. Cf. *Kaiser Steel Corp.* v. *W. S. Ranch Co.,* 391 U. S. 593, 594 (1968).

Though he acknowledges that our earlier cases invoking the domestic relations exceptions speak in jurisdictional terms, JUSTICE BLACKMUN nevertheless would reinterpret them to support a special abstention doctrine for such cases. See *post,* at 713–716 (opinion concurring in judgment). Yet in briefly sketching his vision of how such a doctrine might operate, JUSTICE BLACKMUN offers no authoritative support for where such an abstention doctrine might be found, no principled reason why we should retroactively concoct an abstention doctrine out of whole cloth to account for federal court practice in existence for 82 years prior to the announcement of the first abstention doctrine in *Railroad Comm'n of Texas* v. *Pullman Co.,* 312 U. S. 496 (1941), and no persuasive reason why articulation of such an abstention doctrine offers a sounder way of achieving the same result than our construction of the statute.

suit is appropriate for the exercise of § 1332 jurisdiction given the existence of diverse citizenship between petitioner and respondents and the pleading of the relevant amount in controversy. Accordingly, we reverse the decision of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in the judgment.

I agree with the Court that the District Court had jurisdiction over petitioner's claims in tort. Moreover, I agree that the federal courts should not entertain claims for divorce, alimony, and child custody. I am unable to agree, however, that the diversity statute contains any "exception" for domestic relations matters. The Court goes to remarkable lengths to craft an exception that is simply not in the statute and is not supported by the case law. In my view, the longstanding, unbroken practice of the federal courts in refusing to hear domestic relations cases is precedent at most for continued discretionary abstention rather than mandatory limits on federal jurisdiction. For these reasons I concur only in the Court's judgment.

## I

The Court holds that the diversity statute contains an "exception" for cases seeking the issuance of a divorce, alimony, or child custody decree. *Ante,* at 701–704. Yet no such exception appears in the statute. The diversity statute is not ambiguous at all. It extends the jurisdiction of the district courts to "*all* civil actions" between diverse parties involving the requisite amount in controversy. 28 U. S. C. § 1332 (emphasis added).

This Court has recognized that in the absence of a "clearly expressed" intention to the contrary, the language of the statute itself is ordinarily "conclusive." See, *e. g., Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S.

102, 108 (1980). The Court apparently discovers in the history of the diversity statute and this Court's own case law a clearly expressed intention contrary to the words of the statute. First, the Court observes that the diversity statute formerly extended only to "all suits of a civil nature at common law or in equity" rather than to "all civil actions." *Ante,* at 698. Then the Court interprets this Court's decision in *Barber* v. *Barber,* 21 How. 582 (1859), to read into this "common law or equity" limitation an exclusion of matters, such as actions for divorce and alimony, that were not cognizable in the English courts of common law and equity. *Ante,* at 698–699. The Court points to what it regards as Congress' "apparent acceptance" of this construction of the diversity statute. *Ante,* at 700. Finally, notwithstanding Congress' replacement in 1948 of the "common law and equity" limitation with the phrase "all civil actions," the Court considers this to be evidence that Congress adopted the prior "well-known construction" of the diversity statute. *Ibid.*

I have great difficulty with the Court's approach. Starting at the most obvious point, I do not see how a language change that, if anything, expands the jurisdictional scope of the statute can be said to constitute evidence of approval of a prior narrow construction.[1] Any inaction on the part of Congress in 1948 in failing expressly to mention domestic relations matters in the diversity statute reflects the fact, as is discussed below, that Congress likely had no idea until the

---

[1] To be sure, this modification in language was part of a wholesale revision of the Judicial Code in 1948, and this Court has recognized that "no changes of law or policy are to be presumed from changes of language in the revision unless an intent to make such changes is clearly expressed." *Fourco Glass Co.* v. *Transmirra Products Corp.,* 353 U. S. 222, 227 (1957); see *Finley* v. *United States,* 490 U. S. 545, 554 (1989). This principle may negate an inference that the change in language expanded the scope of the statute, but it does not affirmatively authorize an inference that Congress' recodification was designed to approve of prior constructions of the statute.

Court's decision today that the diversity statute contained an exception for domestic relations matters.

This leads to my primary concern: the Court's conclusion that Congress understood *Barber* as an interpretation of the diversity statute. *Barber* did not express any intent to construe the diversity statute—clearly, *Barber* "cited no authority and did not discuss the foundation for its announcement" disclaiming jurisdiction over divorce and alimony matters. *Ante*, at 694. As the Court puts it, it may only be "inferred" that the basis for declining jurisdiction was the diversity statute. *Ante*, at 699. It is inferred not from anything in the *Barber majority* opinion. Rather, it is inferred from the comments of a dissenting Justice and the absence of rebuttal by the *Barber* majority. *Ante*, at 699.[2] The Court today has a difficult enough time arriving at this unlikely interpretation of the *Barber* decision. I cannot imagine that Congress ever assembled this construction on its own.

In any event, at least three subsequent decisions of this Court seriously undermine any inference that *Barber*'s recognition of a domestic relations "exception" traces to a "common law or equity" limitation of the diversity statute. In *Simms* v. *Simms*, 175 U. S. 162 (1899), the Court heard an appeal by a husband from the Supreme Court of the Territory of Arizona affirming the territorial District Court's dismissal of his bill for divorce and its award to his wife of alimony and counsel fees *pendente lite*. The wife sought dismissal of the appeal to this Court because the suit involved domestic relations. In contrast to *Barber*, the Court

---

[2] Moreover, as the Court intimates, *ante*, at 699, and n. 4, there is good reason to question the *Barber* dissent's interpretation of English practice. The historical evidence, while not unequivocal, suggests that the English chancery courts did in fact exercise some jurisdiction over matrimonial matters. See, *e. g.*, *Lloyd* v. *Loeffler*, 694 F. 2d 489, 491–492 (CA7 1982); *Spindel* v. *Spindel*, 283 F. Supp. 797, 802–803, 806–809 (EDNY 1968); Atwood, Domestic Relations Cases in Federal Court: Toward a Principled Exercise of Jurisdiction, 35 Hastings L. J. 571, 584–585 (1984).

undertook an extensive review and discussion of the statutory bases for its jurisdiction over the appeal. It expressly recognized that its appellate jurisdiction was confined to "those cases, and those cases only, *at law or in equity.*" 175 U. S., at 167 (emphasis added).[3] Nevertheless, the Court in *Simms* did not find the "common law or equity" limitation to be a bar to jurisdiction.[4] The Court distinguished *Barber,* not on grounds that the jurisdictional statute in *Barber* was limited to cases in law and equity while that in *Simms* was not—indeed, it could not be so distinguished. The Court distinguished *Barber* on grounds that it involved domestic relations matters in the States rather than in the Territories. It reasoned that the whole subject of domestic relations "belongs to the laws of the State, and not to the laws of the United States," while "[i]n the Territories of the United States, Congress has the entire dominion and sovereignty, national and local." 175 U. S., at 167–168. Today the Court infers an interpretation of *Barber* that the Court in *Simms* plainly rejected.

The second decision undermining the Court's interpretation of *Barber* is *De la Rama* v. *De la Rama,* 201 U. S. 303 (1906), in which the Court took jurisdiction over an appeal

---

[3] The Court stated:

"[T]he appellate jurisdiction of this court to review and reverse or affirm the final judgments and decrees of the Supreme Court of a Territory includes those cases, and those cases only, at law or in equity, in which 'the matter in dispute, exclusive of costs, shall exceed the sum of five thousand dollars.'" 175 U. S., at 167.

See also *id.,* at 166 (citing the Act of Mar. 3, 1885, ch. 355, 23 Stat. 443, limiting appellate jurisdiction from the territorial courts to "any suit at law or in equity").

[4] The Court concluded it could not review the question of divorce, because it involved "no matter of law, but mere questions of fact" and because, contrary to the statutory amount-in-controversy requirement, it involved "a matter the value of which could not be estimated in money." 175 U. S., at 168–169. It modified and affirmed the alimony award. *Id.,* at 172.

from the Supreme Court of the Philippine Islands in a wife's action for divorce and alimony. Citing *Barber*, *De la Rama* explained the historical reasons that federal courts have not exercised jurisdiction over actions for divorce and alimony. The "common law or equity" limitation the Court now finds so significant was not among those reasons.[5]  This was so even though the appellate jurisdictional statute at issue there extended to "all actions, cases, causes, and proceedings," 32 Stat. 695, opening the door for the Court easily to have distinguished *Barber* on the grounds of the "common law or equity" limitation in the diversity statute. Instead, explicitly reaffirming the grounds relied upon in *Simms* for distinguishing *Barber*, the Court pointed to the absence of any need to defer to the States' regulation of the area of domestic relations in the context of an appeal from a non-state, territorial court. 201 U. S., at 308.

The third decision is *Ohio ex rel. Popovici* v. *Agler*, 280 U. S. 379 (1930). In *Popovici*, a Roumanian vice consul was sued by his wife in an Ohio state court for a divorce and alimony. He defended by claiming that the Ohio state court had no jurisdiction to grant the divorce, because federal statutes granted *exclusive* jurisdiction to the federal courts of " 'all suits and proceedings against . . . consuls or vice-consuls' " and " 'all suits against consuls and vice-consuls.' "

---

[5] The Court in *De la Rama* justified the exception "both by reason of fact that the husband and wife cannot usually be citizens of different States, so long as the marriage relation continues (a rule which has been somewhat relaxed in recent cases), and for the further reason that a suit for divorce in itself involves no pecuniary value." 201 U. S., at 307. The first reason obviously was discounted by *De la Rama* itself and is of course untenable today. The second reason can apply only to nonmonetary divorce actions but not to actions for alimony above the amount-in-controversy limitation. The second reason, moreover, was disclaimed by *De la Rama* itself in joint divorce and alimony actions. *Id.*, at 310. At any rate, in view of *De la Rama*'s explanation, surely the Court is mistaken when it states it "has never addressed the basis" for the domestic relations exception. *Ante*, at 694.

*Id.,* at 382–383 (quoting the Act of Mar. 3, 1911, ch. 231, 36 Stat. 1161, 1093). Rejecting this claim, Justice Holmes observed for a unanimous Court that the jurisdictional statutes "do not affect the present case if it be true as has been unquestioned for three-quarters of a century that the Courts of the United States have no jurisdiction over divorce." 280 U. S., at 383. The Court traced this absence of jurisdiction not to the diversity statute but apparently to the Constitution itself:

> "If when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States, there is no difficulty in construing the instrument accordingly and not much in dealing with the statutes. 'Suits against consuls and vice-consuls' must be taken to refer to ordinary civil proceedings and not to include what formerly would have belonged to the ecclesiastical Courts." *Id.,* at 383–384.

I think it implausible to believe that, especially after *Popovici,* Congress could be said to have accepted this Court's decision in *Barber* as simply a construction of the diversity statute.[6] Accordingly, the Court is without a requisite foundation for ratifying what Congress intended. Cf. *Flood* v. *Kuhn,* 407 U. S. 258, 283–284 (1972) (declining to overturn

---

[6] The Court claims that "by hearing appeals from legislative, or Article I, courts, this Court implicitly has made clear its understanding that the source of the constraint on jurisdiction from *Barber* was *not* Article III; otherwise the Court itself would have lacked jurisdiction over appeals from these legislative courts." *Ante,* at 696–697. The Court, however, overlooks the rule that "[w]hen questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Hagans* v. *Lavine,* 415 U. S. 528, 535, n. 5 (1974); see *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 119 (1984). This Court has never understood the rule differently. *United States* v. *More,* 3 Cranch 159, 172 (1805) (Marshall, C. J.) (statement at oral argument).

prior precedent *explicitly* exempting professional baseball from antitrust laws where Congress "by its positive inaction" has allowed prior decisions to stand).

Even assuming the Court today correctly interprets *Barber*, its extension of any domestic relations "exception" to the diversity statute for child custody matters is not warranted by any known principles of statutory construction. The Court relies on *In re Burrus*, 136 U. S. 586 (1890), in which the Court denied the "jurisdiction" of a Federal District Court to issue a writ of habeas corpus in favor of a father to recover the care and custody of his child from the child's grandfather. That case did not involve the diversity statute, but rather the habeas corpus statute, and the Court expressly declined to address the diversity statute.[7] *Id.*, at 597. To the Court today this is just a "technica[l]" distinction. *Ante*, at 703. I find it germane, because, to the best of my knowledge, a court is not at liberty to craft exceptions to statutes that are not at issue in a case.

## II

### A

To reject the Court's construction of the diversity statute is not, however, necessarily to reject the federal courts' long-

---

[7] If, in *Barber*, the Court might have been said plausibly to have relied on limitations of the English chancery courts with respect to divorce and alimony, it seems highly unlikely that the Court in *Burrus* might have relied on a similar justification for child custody matters. The Court in *Burrus* attached as an appendix to its opinion, 136 U. S., at 597, a "very instructive" and "a very careful and a very able opinion," *In the Matter of Barry*, from the Circuit Court of the United States for the Southern District of New York. See *In re Burrus*, 136 U. S., at 594. That opinion stated that child custody matters "res[t] solely in England on the common law" and that such determinations "devolved upon the high courts of equity and law." *Id.*, at 609. See also *Lehman* v. *Lycoming County Children's Services Agency*, 458 U. S. 502, 524 (1982) (dissenting opinion) ("Historically, the English common-law courts permitted parents to use the habeas writ to obtain custody of a child as a way of vindicating their own rights").

standing practice of declining to hear certain domestic relations cases. My point today is that no coherent "jurisdictional" explanation for this practice emerges from our line of such cases, and it is unreasonable to presume that Congress divined and accepted one from these cases. To be sure, this Court's old line of domestic relations cases disclaimed "jurisdiction" over domestic relations matters well before the growth and general acceptance in recent decades of modern doctrines of federal abstention that distinguish the refusal to exercise jurisdiction from disclaiming jurisdiction altogether. See generally C. Wright, Federal Courts 302–330 (1983) (discussing growth of traditional abstention doctrines). See also *Francis* v. *Henderson*, 425 U. S. 536, 538–539 (1976) (recognizing abstention in the context of the habeas corpus statute where "considerations of comity and concerns for the orderly administration of criminal justice require"). Nevertheless, the common concern reflected in these earlier cases is, in modern terms, abstentional—and not jurisdictional—in nature. These cases are premised not upon a concern for the historical limitation of equity jurisdiction of the English courts, but upon the virtually exclusive primacy at that time of the States in the regulation of domestic relations. As noted above, in *Simms* and *De la Rama*, this Court justified its exercise of jurisdiction over actions for divorce and alimony not by any reference to the scope of equity jurisdiction but by reference to the absence of any interest of the States in appeals from courts in territories controlled by the National Government. Similarly, in cases wholly outside the "common law or equity" limitation of the diversity statute, the Court has denied federal court review. *Ohio ex rel. Popovici* v. *Agler*, 280 U. S. 379 (1930) (consuls and vice-consuls statutes); *In re Burrus*, *supra* (habeas corpus). As the Court once stated: "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *Id.*, at 593–594.

Whether the interest of States remains a sufficient justification today for abstention is uncertain in view of the expansion in recent years of federal law in the domestic relations area.[8]   I am confident, nonetheless, that the unbroken and unchallenged practice of the federal courts since before the War Between the States of declining to hear certain domestic relations cases provides the very rare justification for continuing to do so.   It is not without significance, moreover, that, because of this historical practice of the federal courts, the States have developed specialized courts and institutions in family matters, while Congress and the federal courts generally have not done so.   Absent a contrary command of Congress, the federal courts properly should abstain, at least from diversity actions traditionally excluded from the federal courts, such as those seeking divorce, alimony, and child custody.

The Court is correct that abstention "rarely should be invoked." *Ante,* at 705.   But rarer still—and by far the greater affront to Congress—should be the occasions when this Court invents statutory exceptions that are simply not there.   It is one thing for this Court to defer to more than a century of practice unquestioned by Congress.   It is quite

---

[8] See, *e. g.,* Victims of Child Abuse Act of 1990, 104 Stat. 4792, 42 U. S. C. § 13001 *et seq.;* Family Violence Prevention and Services Act, 98 Stat. 1757, 42 U. S. C. § 10401 *et seq.;* Parental Kidnaping Prevention Act of 1980, 94 Stat. 3568, 28 U. S. C. § 1738A; Adoption Assistance and Child Welfare Act of 1980, 94 Stat. 500–521, 42 U. S. C. §§ 620–628, 670–679a; Child Abuse Prevention and Treatment and Adoption Reform Act of 1978, 92 Stat. 208–211, 42 U. S. C. §§ 5111–5115; Child Abuse Prevention and Treatment Act, 88 Stat. 4, 42 U. S. C. § 5101 *et seq.*

Like the diversity statute, the federal-question grant of jurisdiction in Article III of the Constitution limits the judicial power in federal-question cases to "Cases, in Law and Equity."   Art. III, § 2.   Assuming this limitation applies with equal force in the constitutional context as the Court finds today that it does in the statutory context, the Court's decision today casts grave doubts upon Congress' ability to confer federal-question jurisdiction (as under 28 U. S. C. § 1331) on the federal courts in any matters involving divorces, alimony, and child custody.

another to defer on a pretext that Congress legislated what in fact it never did. Although there is no occasion to resolve the issue in definitive fashion in this case, I would suggest that principles of abstention provide a more principled basis for the Court's continued disinclination to entertain domestic relations matters.[9]

## B

Whether or not the domestic relations "exception" is properly grounded in principles of abstention or principles of jurisdiction, I do not believe this case falls within the exception. This case only peripherally involves the subject of "domestic relations." "Domestic relations" actions are loosely classifiable into four categories. The first, or "core," category involves declarations of status, *e. g.,* marriage, annulment, divorce, custody, and paternity. The second, or "semicore," category involves declarations of rights or obligations arising from status (or former status), *e. g.,* alimony, child support, and division of property. The third category consists of secondary suits to enforce declarations of status, rights, or obligations. The final, catchall category covers the suits not directly involving status or obligations arising from status but that nonetheless generally relate to domestic relations matters, *e. g.,* tort suits between family or former family members for sexual abuse, battering, or intentional infliction of emotional distress. None of this Court's prior cases that consider the domestic relations "exception" involves the type of periphery domestic relations claim at issue here.

---

[9] As this Court has previously observed that the various types of abstention are not "rigid pigeonholes," *Pennzoil Co.* v. *Texaco Inc.,* 481 U. S. 1, 11, n. 9 (1987); *New Orleans Public Service, Inc.* v. *Council of New Orleans,* 491 U. S. 350, 359 (1989), there is no need to affix a label to the abstention principles I suggest. Nevertheless, I fully agree with the Court that *Younger* abstention is inappropriate on the facts before us, because of the absence of any pending state proceeding.

Petitioner does not seek a determination of status or obligations arising from status. Moreover, any federal court determination of petitioner's claims will neither upset a prior state court determination of status or obligations appurtenant to status nor pre-empt a pending state court determination of this nature. Cf. *Moore* v. *Sims*, 442 U. S. 415 (1979) (applying *Younger* abstention doctrine to prevent federal court action seeking to enjoin pending state child custody proceeding brought by state authorities). While petitioner's claims do not involve a federal question or statute—the presence of which would strongly counsel against abstention, see *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 815, n. 21 (1976)—petitioner's state-law tort claims for money damages are easily cognizable in a federal court. All these considerations favor the exercise of federal jurisdiction over petitioner's claims.

JUSTICE STEVENS, with whom JUSTICE THOMAS joins, concurring in the judgment.

This should be an exceedingly easy case.* As demonstrated by each of the opinions, whatever belief one holds as to the existence, origin, or scope of a "domestic relations exception," the exception does not apply here. However one understands 18th-century English chancery practice and however one construes the Judiciary Act of 1789, the result is the same. The judgment of the Court of Appeals must be

---

*The first Justice Harlan cautioned long ago that "'it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law.'" *United States* v. *Clark*, 96 U. S. 37, 49 (1878) (dissenting opinion) (quoting *East India Co.* v. *Paul*, 7 Moo. 85, 111, 13 Eng. Rep. 811, 821 (P. C. 1849)). Courts should observe similar caution with regard to easy cases. Cf. *O'Bannon* v. *Town Court Nursing Center*, 447 U. S. 773, 804 (1980) (BLACKMUN, J., concurring in judgment) ("[E]asy cases make bad law"); *Burnham* v. *Superior Court of Cal., County of Marin*, 495 U. S. 604, 640 (1990) (STEVENS, J., concurring in judgment). An easy case is especially likely to make bad law when it is unnecessarily transformed into a hard case.

reversed. For that reason, I would leave for another day consideration of whether any domestic relations cases necessarily fall outside of the jurisdiction of the federal courts and of what, if any, principle would justify such an exception to federal jurisdiction.

As I agree that this case does not come within any domestic relations exception that might exist, I concur in the judgment.