**UNITED STATES of America, Plaintiff,**

v.

**Mark J. HOPPER, Defendant.**

**No. EV95–0014M–01 R/H.**

United States District Court,
S.D. Indiana,
Evansville Division.

Sept. 28, 1995.

---

Timothy M. Morrison, U.S. Atty., Indianapolis, IN, for plaintiff. ·

Timothy Dodd, Evansville, IN, for defendant.

## MEMORANDUM DECISION

HUSSMANN, United States Magistrate Judge.

This matter is before the Court on the defendant's Motion to Dismiss Criminal Complaint filed August 30, 1995. Plaintiff filed its Response on September 15, 1995. No reply brief was filed.

### Factual Background

Defendant Mark J. Hopper is charged in a Criminal Complaint with violation of 18 U.S.C. § 228, referred to as the Child Support Recovery Act of 1992 (CSRA). That Act, effective October 22, 1992,[1] provides:

§ 228. **Failure to pay legal child support obligations**

(a) **Offense.**—Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b).

\* \* \* \* \* \*

(d) **Definitions.**—As used in this section—

(1) the term "past due support obligations" means any amount—

(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and

(B) that has remained unpaid for a period longer than one year, or is greater than $5,000; and

(2) the term "State" includes the District of Columbia, and any other possession or territory of the United States.

The Probable Cause Affidavit in support of the Criminal Complaint alleges that Hopper

---

1. *See* Pub.L. No. 102–521, § 2(a), 106 Stat. 3403 (October 25, 1992).

and Roberta Schaefer, the custodial parent, were married in 1976 and divorced in Vanderburgh County, Indiana, in 1978. Roberta Schaefer and one child born of the marriage, Travis (now 17 years old), reside in California. Hopper continues to reside in Indiana.

According to Vanderburgh Superior Court records, Hopper was ordered to pay $30 per week child support when the divorce was granted August 24, 1978. On June 3, 1993, the Vanderburgh Superior Court issued an "Order on Information for Contempt and Petition to Modify." That Order increased Hopper's child support obligation to $75 per week and issued an Income Withheld Order[2] beginning June 4, 1993. The Order found Hopper to be $18,670 in arrears on child support payments (plus other medical, insurance and attorney fee obligations), and sentenced Hopper to one year in jail for contempt.

The Probable Cause Affidavit does not reflect whether Hopper did in fact serve time in jail, or whether he purged himself of contempt in some manner.

The Probable Cause Affidavit alleges that since the effective date of the CSRA, Hopper has made only sporadic payments on his child support obligation. Between the effective date of the CSRA (October 22, 1992) and May 23, 1995, Hopper has accrued $5,335 in arrearages. The Probable Cause Affidavit alleges willful violation of the CSRA because Hopper claimed income of approximately $24,750 during 1992 (a part of the period after the enactment date.)

### Discussion

The Defendant's Motion to Dismiss does not specifically argue why the CSRA is unconstitutional. It urges this Court to adopt the reasoning of District Judge Rosenblatt in two cases decided July 26, 1995. *United States v. Mussari*, 894 F.Supp. 1360 (D.Ariz.), and *United States v. Schroeder*, 894 F.Supp. 360 (D.Ariz.)

In those two cases, Judge Rosenblatt found that using the analysis in *United States v. Lopez*, — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the CSRA is not substantially related to interstate commerce, and is therefore beyond the scope of congressional power under the Commerce Clause. Judge Rosenblatt also concluded that the CSRA violates the Tenth Amendment because the subject matter of the Act intrudes upon powers reserved to the states. The opinion does not specifically list what state powers the Act imposes on, but it appears that the powers to regulate marital and family relationships are those which Judge Rosenblatt felt are impeded. Judge Rosenblatt also felt that "principles of federalism and comity" required the District Court to conclude that the CSRA violated the Constitution.

Two other courts have addressed this issue to date. *United States v. Hampshire*, 892 F.Supp. 1327 (D.Kan.), and *United States v. Murphy*, 893 F.Supp. 614 (W.D.Va.). These two cases have concluded that the CSRA is constitutional. With due respect to Judge Rosenblatt, this Court concludes that *Murphy* and *Hampshire* are properly decided.

Judge Rosenblatt initiated his decision by reference to *United States v. Lopez, supra*. In *Lopez*, which struck down the Gun–Free School Zones Act (GFA),[3] the United States Supreme Court identified three broad categories of activity that Congress may regulate under the commerce power:

(1) Congress may regulate the use of the channels of interstate commerce.

(2) Congress may regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat comes only from intrastate activity.

(3) Congress may regulate those activities that substantially affect interstate commerce.

*Lopez* itself was concerned only with the third category, for the GFA is neither a

---

**2.** Pursuant to I.C. 31–2–10–1ff, an income withholding order allows a court order to be sent to an employer who may withhold income from wages and direct that income to the Court to ensure payment of the child support obligation.

**3.** Title 18, United States Code, § 922(q).

regulation of the use of the channels of interstate commerce (Category 1) nor a regulation of an instrumentality of interstate commerce or a thing in interstate commerce (Category 2). *Lopez*, ——— U.S. at ———, 115 S.Ct. at 1630, 131 L.Ed.2d at 638.

Although the GFA specifically included congressional findings and declarations concerning how the activity of gun possession in a school zone substantially affected interstate commerce (*see* 18 U.S.C. § 922(q)(1)), the language in the statute which proscribed conduct did not explicitly require as an element of the crime any nexus with interstate commerce. The Supreme Court in *Lopez* held that absent this jurisdictional element, the relationship between interstate commerce and the possession of a firearm within a school zone was too tenuous to justify Congress' intrusion into a matter of criminal law primarily of local concern. *Lopez*, ——— U.S. at ———, 115 S.Ct. at 1631, 131 L.Ed.2d at 642–43.

Unlike the GFA, the CSRA does explicitly require as an element of the crime that there be a willful failure to provide support to a child "who resides in another state." As such, the power of federal law enforcement authorities cannot be invoked upon matters of family law when the parties thereto remain within the bounds of any particular state. The CSRA requirement of having a willful failure to support a child who resides *in another state* recognizes the sovereignty of each state in matters of domestic relations law, and the limited jurisdictional power of state authorities to go beyond their geographical boundaries to enforce their orders.

This Court therefore concludes that Congress has more explicitly limited its enforcement powers in the CSRA than it did in the GFA. However, the mere limitations by Congress of the circumstances under which its enforcement powers may be involved, does not necessarily establish that the activity proscribed substantially affects "interstate commerce."

■ Judge Rosenblatt takes the position in *Mussari* that the collection of a debt is *not* commerce. The Court believes that the act of collecting an obligation, though dealing with an intangible, does amount to commerce. In *United States v. Shubert*, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955), the United States Supreme Court discussed the terms "Trade or Commerce" as those were applied in the Sherman Act. "Trade or Commerce" included the conduct of "real estate brokerage (*United States v. National Association of Real Estate Boards*, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007); the gathering and distribution of news (*Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013); medical services to members of a health cooperative (*American Medical Assn. v. United States*, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434); and insurance underwriting (*United States v. South–Eastern Underwriters Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440)." *Shubert* found that commerce exists where there is a "continuous and indivisible stream of intercourse among the states involving the transmission of large sums of money and communications by mail, telephone and telegraph." *Shubert*, 348 U.S. at 226, 75 S.Ct. at 280.

In *United States v. South–Eastern Underwriters Assn.*, *supra*, the Supreme Court addressed whether fire insurance transactions which stretch across state lines constitute "Commerce among the several states" so as to make them subject to regulation by Congress under the Commerce Clause. *South–Eastern Underwriters*, 322 U.S. at 538–39, 64 S.Ct. at 1165–66. In response to the argument that an insurance contract was not a commodity, and was merely a personal contract subject to the laws of the state where it was executed, the Supreme Court states:

> But both before and since *Paul v. Virginia* [75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1868) ] this Court has held that Congress can regulate traffic though it consist of intangibles. Another reason much stressed has been that insurance policies are mere personal contracts subject to the laws of the state where executed. But this reason rests upon a distinction between what has been called "local" and what "interstate," a type of mechanical criterion which this Court has not deemed controlling in the measurement of federal power. *Cf. Wickard v. Filburn*, 317 U.S. 111, 119–120, 63 S.Ct. 82, 86, 87 L.Ed. 122; *Parker v.*

*Brown,* 317 U.S. 341, 360, 63 S.Ct. 307, 318, 87 L.Ed. 315. We may grant that a contract of insurance, considered as a thing apart from negotiation and execution, does not itself constitute interstate commerce. *Cf. Hall v. Geiger–Jones Co.,* 242 U.S. 539, 557–558, 37 S.Ct. 217, 223, 224, 61 L.Ed. 480. But it does not follow from this that the Court is powerless to examine the entire transaction, of which that contract is but a part, in order to determine whether there may be a chain of events which becomes interstate commerce. Only by treating the congressional power over commerce among the states as a "technical legal conception" rather than as a "practical one, drawn from the course of business" could such a conclusion be reached. *Swift & Co. v. United States,* 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518. In short, a nationwide business is not deprived of its interstate character merely because it is built upon sales contracts which are local in nature. Were the rule otherwise, few businesses could be said to be engaged in interstate commerce.

*Id.* at 546, 64 S.Ct. at 1170 (footnotes omitted).

This Court must conclude that the collection of child support orders across state lines does involve a continuous and indivisible stream of intercourse among the states involving the transmission of large sums of money and communications by mail, telephone and telegraph. Though each individual transaction may be the result of an order of a court generated intrastate, a chain of events begins when one parent, custodial or noncustodial, moves across state lines. Child support obligations not voluntarily made become difficult to collect once one parent leaves the boundaries of a particular state. Payment of support results in large sums of money being transmitted, and the amount of child support not paid is significant.[4] Clearly, attempts to collect that past due support involve the mail, telephone and telegraph. This Court must therefore conclude that the CSRA is a proper congressional regulation of an activity that substantially relates to interstate commerce.

Because of this conclusion, this Court need not address at length the other holdings which are found in Judge Rosenblatt's opinion in *Mussari* and which this defendant has adopted. Because this Court concludes that Congress was acting within the scope of the powers granted to it under the Commerce Clause, the Tenth Amendment's proscription against federal legislation in areas reserved to the states does not apply.

Judge Rosenblatt also suggests that principles of federalism and comity support his decision to conclude that the CSRA is unconstitutional. While principles of federalism and comity do suggest that federal courts should generally not interfere with state criminal prosecutions, and other state law functions, this Court can find no case where those "principles" were held to be grounds to declare an act of Congress unconstitutional. The principles of federalism and comity are made evident in a concrete manner when a federal court "abstains" from taking certain actions or deciding certain cases.

■ The abstention doctrine is designed to promote federal-state comity, under which the court may refuse to exercise jurisdiction in a matter which would disrupt the establishment of a coherent state policy. Under the abstention doctrine articulated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the court may abstain from jurisdiction so as not to interfere with a pending state criminal prosecution. *Younger,* 401 U.S. at 54, 91 S.Ct. at 755. Because federal courts have a "virtually unflagging obligation" to exercise the jurisdiction extended to them, abstention should rarely be invoked. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). In the present case, the *Younger* abstention is inapplicable because there are no pending state criminal proceedings which this Court may defer to.

4. The legislative history referred to in *Hampshire, supra,* indicates that 3.2 million families lived below the poverty level in 1989, that $16.3 billion was due as child support during that time, and that only $11.2 billion in support was paid.

Judge Rosenblatt's decision also seems to reflect that the federal court's historically limited role in matters of domestic relations serves as a basis for declaring the CSRA unconstitutional. The role of the federal courts in this area was discussed most recently by the United States Supreme Court in *Ankenbrandt v. Richards,* 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). In a thorough review of the history of domestic relations matters before federal courts, the Supreme Court discussed the case of *Barber v. Barber,* 62 U.S. 582, 21 How. 582, 16 L.Ed. 226 (1859). *Barber* established limits on a federal court's power to intervene in a domestic relations matter *prior to* rendering a divorce decree and order of alimony, but concluded that a federal court of equity might "interfere" *to enforce* the decree. *See Ankenbrandt,* 504 U.S. at 701, 112 S.Ct. at 2213–14. *Ankenbrandt* concluded that based upon a "long-held understanding," and "sound policy considerations," the domestic relations exception to federal court diversity jurisdiction divests a federal court of power to issue divorce, alimony and child custody decrees. *Id.* at 703, 112 S.Ct. at 2214–15. But in so concluding, the *Ankenbrandt* court did find that diversity jurisdiction existed for a lawsuit seeking a tort remedy for personal injury inflicted upon children by a father. It would appear to this Court that if a child can bring a personal injury action against a parent outside the domestic relations exception, then that same child's action to recover a support obligation, at least as the obligation is already reduced to judgment, would also fall outside the federal court's domestic relations exception.

*Ankenbrandt* does suggest that in certain cases involving domestic relations cases, abstention principles might be applicable. Abstention would be proper when a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case." *Id.* at 705–06, 112 S.Ct. at 2216. However, in Mr. Hopper's case, no such "difficult questions of state law bearing on policy problems" appear. The criminal case before this Court will determine whether Mr. Hopper has "willfully failed to make child support payments." There are no issues of Indiana law which are of great importance from a public policy perspective immediately apparent in this case. Therefore, this Court concludes that it need not abstain from deciding the case at bar, and that principles of federalism and comity do not mandate, nor allow this Court to conclude that the CSRA is unconstitutional.

### Conclusion

With due respect to Judge Rosenblatt, this Court concludes that the language of the CSRA specifically limits itself to circumstances involving interstate commerce, that the collection of child support payments is a matter that substantially affects interstate commerce, and that the CSRA is a regulation of interstate commerce within the authority given Congress by Article I, Section 8, Clause 3, of the Constitution.

As such, it is within the powers delegated to Congress, does not impermissibly intrude upon powers relegated to the states, and does not therefore violate the Tenth Amendment. Principles of federalism and comity do not require this Court to abstain in this case. The Motion to Dismiss is therefore DENIED. The Court does note that several interesting issues remain to be resolved in this case. It appears that the CSRA was aimed at providing a tool for enforcement authorities to prosecute "runaway" parents who flee a jurisdiction to avoid state enforcement of child support obligations. It appears that Mr. Hopper has never left Indiana, and has never been outside the jurisdiction of the Indiana courts which presumptively have ample power to both bring him into compliance, and to punish him criminally for willful failure to support his child.[5] The Court also notes that while a portion of Hopper's child support obligation incurred after October 22, 1992, has been reduced to an order finding him in arrears, and in contempt, much of the arrearage that has accrued since June 3, 1993, has never been reduced to judgment in an Indiana court. Whether principles of abstention described above should be applied to

---

5. *See* I.C. 35–46–1–5, Non–Support of a Child.

those portions of the child support obligation not yet determined by Indiana courts to be in arrears, is an issue that the Court wishes to be briefed prior to trial in this action. These interesting issues need not be addressed before this Court concludes that the CSRA is not unconstitutional.

**SO ORDERED.**