**UNION PACIFIC RAILROAD COMPANY,**

v.

**Susan Strohmeyer BOLTON, et al.**

**Civ. A. No. 93–3405.**

United States District Court, E.D. Louisiana.

Dec. 17, 1993.

---

William H. Howard, III, Stephanie M. Keller, Phelps Dunbar, New Orleans, LA, for plaintiff.

Eunice Slaton Charles, Gretna, LA, for defendants.

### *ORDER AND REASONS*

FELDMAN, District Judge.

This motion asks a new question: Can the federal interpleader statute be used to avoid the domestic relations exception to federal subject matter jurisdiction? The answer is, no.

Union Pacific Railroad filed this interpleader action to extricate itself from conflicting state court judgments that arose out of a bitter divorce and child support dispute. Because the underlying quarrel so patently involves a lengthy domestic fight over paternity and entitlement to child support payments, the Court requested the parties to address whether the Court has jurisdiction of this interpleader proceeding. The Court finds that it lacks subject matter jurisdiction, and UPRR's interpleader action is dismissed.

## I. Background

### A. The Family Fight

This sad tale arises out of the broken marriage of Susan Strohmeyer and Robert Wayne Bolton.[1] On February 23, 1981, Strohmeyer filed suit for a judicial separation in state court in Jefferson Parish, Louisiana. On April 10, 1981, that court granted Strohmeyer a judicial separation; it held that Bolton fathered Strohmeyer's child; and it awarded Strohmeyer child support. Bolton, who now says he was mistaken at the time, did not contest paternity in the Louisiana case. (Bolton observes that he was misled and did not contest paternity because the child had been born during the marriage and was almost eight months old when suit was filed. He adds that Louisiana Civil Code Article 189 prevented him from contesting paternity.)[2]

### B. The States Fight

The problem the railroad faces did not develop until October of 1990, when Strohmeyer sued Bolton for an increase in child support in Nebraska, where Bolton presently lives and works for the railroad. Bolton chose to contest paternity in the Nebraska court, and he succeeded. The Nebraska court ordered Strohmeyer and her child to submit to blood tests to enable the court to adjudicate the paternity issue.[3] Strohmeyer refused to submit to blood testing. Because Nebraska (like Louisiana) allows a court to find against the party who refuses to submit to a blood test,[4] the Nebraska court stayed any further child support payments until Strohmeyer submitted to blood testing. That order was entered September 30, 1991. It prohibited Strohmeyer from doing anything to collect child support from Bolton,

and it was extended to prohibit UPRR from taking any steps which would assist Strohmeyer to collect child support.

The Nebraska court held that Bolton was not the father of Strohmeyer's child. Unhappy with the courts in Nebraska, Strohmeyer returned to Louisiana and sought an increase in child support and a wage assignment. It is said that Strohmeyer never told the Louisiana court of the events in Nebraska. On March 13, 1992, the Louisiana court issued an Income Assignment which directed UPRR to withhold income from Bolton's monthly wages in the amount of $855.93 on account of the child support payments the Louisiana court said Bolton owed Strohmeyer. It does not appear that the Louisiana court sought to reconcile the Nebraska events with its order. Regrettably, Nebraska seems not to have cared much about Louisiana either, as this feud unfolded between the states with everyone caught in the middle.

Two weeks after issuance of the Income Assignment order, an employee of UPRR, Rita Jensen, wrote to the Louisiana court and included a copy of the Nebraska court's order, stating that UPRR believed it could not comply with the Income Assignment order. In response, on April 8, 1992, a hearing officer from the Louisiana court, Carol Accardo, wrote UPRR and took the position that the Nebraska order did not enjoin execution of the Louisiana Income Assignment order. Subsequently, for some reason, the Louisiana court recanted, and on June 24, 1992 it granted Bolton's Petition to Recognize and Enforce a Foreign Judgment and recalled the earlier Income Assignment order. Then confusion began to reign. Less

---

1. To avoid adding to the confusion, the Court will refer to the wife as Susan Strohmeyer. Although she has been given notice of these proceedings, she has not filed any papers. Nevertheless, her silence has no bearing on the Court's determination of its subject matter jurisdiction.

2. La.Civ.Code art. 189 provides:

   A suit for disavowal of paternity must be filed within one hundred eighty days after the husband learned or should have learned of the birth of the child; but, if the husband for reasons beyond his control is not able to file

suit timely, then the time for filing suit shall be suspended during the period of such inability.

3. That is exactly what would happen under Louisiana law as well. La.R.S. 13:1681 dictates that "[i]f the obligor asserts as a defense that he is not the father of the child ... the court shall order the alleged father to submit to a blood test ... If the tests are performed pursuant to those provisions and there is corroborating testimony under the provisions of this Part, the court shall adjudicate the paternity issue ..."

4. See La.R.S. 9:396.

than three months later, the Louisiana court dismissed Bolton's Petition to Recognize and Enforce a Foreign Judgment. Bolton unsuccessfully appealed to the Louisiana Fifth Circuit Court of Appeal. Thus, the railroad became the third victim in this amazing story.

The Louisiana court issued a second Income Assignment order on October 2, 1992. It again directed UPRR to withhold $855.93 a month from Bolton's pay check. UPRR withheld the money for two months and sent it to the Louisiana court. But, not to be outdone, on November 30, 1992 the Nebraska court issued a temporary injunction which restrained and enjoined UPRR from complying with the Louisiana Income Assignment order. Strohmeyer then filed a contempt proceeding against the railroad in the Louisiana court; she asked that court to cite UPRR for contempt for not withholding Bolton's wages.

A temporary peace was apparently reached. On May 24, 1993 the Nebraska court dismissed the temporary restraining order. A day later, on May 25, 1993, the Louisiana court dismissed the contempt proceeding against UPRR. Once the Nebraska court's temporary restraining order was no longer effective, UPRR resumed withholding Bolton's wages under the Income Assignment order. UPRR withheld funds from Mr. Bolton's June 1993 pay. But peace was elusive.

In June the Nebraska court reinstated Bolton's injunction petition and again issued a temporary order restraining UPRR from complying with the Income Assignment order. A month and a half later in July, Strohmeyer filed yet another contempt rule against UPRR for failing to withhold Bolton's wages. The second contempt rule is still pending before the Louisiana court.

### C. *The Family Fight Gets Worse*

Bolton has now filed suit against the child's alleged father, Pat Crabtree, in the same Louisiana case in which Strohmeyer obtained her increased child support award and wage assignment orders. Moreover, he recently amended his claim to move against Strohmeyer too because of a recently passed statute, La.R.S. 9:305. That statute appears to revive Bolton's paternity argument in Louisiana, which had previously prescribed.[5]

### D. *What To Do?*

UPRR now faces an impossible situation. The Court is not unsympathetic. The railroad cannot safely obey the order of either state court. Compliance with either court order would be a per se violation of the other. So UPRR has turned to this Court in the hope of extricating itself from its predicament. With this goal in mind, UPRR seeks the following relief: (1) that Bolton and Strohmeyer be required to appear and to assert claims to all money deposited into the registry of the Court in this proceeding; (2) that this Court enter an order restraining and enjoining both Bolton and Strohmeyer, their agents and attorneys, from proceeding against the railroad in any manner until the further orders of this Court; and, most controversial, (3) that this Court issue a preliminary injunction enjoining the cases currently pending in Nebraska and Louisiana, to the extent that such proceedings affect the garnishment of Mr. Bolton's wages. UPRR further asks the Court to discharge it of all liability with respect to the proceeds derived from the garnishment of Mr. Bolton's wages and to discharge it of all liability for violation of either or both state court orders. Finally, UPRR requests the Court to determine the rightful owner of the garnished wages. The functional result of all of this would enmesh this Court in a determination of the child's paternity and Bolton's obligation to support.

---

**5.** R.S. 9:305 states:
[I]f the husband, or legal father who is presumed to be the father of the child, erroneously believed, because of misrepresentation, fraud, or deception by the mother, that he was the father of the child, then the time for filing suit for disavowal of paternity shall be suspended during the period of such erroneous belief or for ten years, whichever ends first.

The statute applies retroactively to allow "a husband or legal father who, because of the mother's misrepresentation, fraud, or deception, erroneously believed he was the father of a child, and whose action for disavowal has prescribed" to bring suit within one hundred eighty days of the effective date of the statute.

In response to a concern this Court raised, UPRR claims that the Court has subject matter jurisdiction under the federal interpleader statute. 28 U.S.C. § 1335. This case falls within the interpleader statute, UPRR asserts, because Bolton and Strohmeyer are citizens of different states who claim adversely to be entitled to Bolton's railroad wages, and because the amount of money at issue, $855.93 a month, exceeds $500. UPRR adds that the so-called "domestic relations exception" to federal jurisdiction does not act as a bar here. But its argument elevates form over substance. UPRR argues that the Court need only determine which competing state court order is entitled to full faith and credit. That argument barely scratches the surface of the essential character of the family dispute. A dispute that directly implicates questions of paternity and support.

In response, Bolton invokes numerous doctrines of abstention, and argues that this Court should abstain from exercising jurisdiction over what he characterizes as a family dispute. Bolton also points out that the paternity issue is presently being litigated in the Louisiana court.

## II.

This dispute, on its surface, certainly falls within the surface reach of the federal interpleader statute. 28 U.S.C. § 1335. Bolton and Strohmeyer are citizens of different states who claim adversely to be entitled to Bolton's railroad wages. The amount of money at issue exceeds the $500 statutory minimum. However, the assumption of subject matter jurisdiction over this case would inappropriately entangle the Court in a domestic dispute.

### A. The Domestic Relations Exception

■ The domestic relations exception to federal diversity jurisdiction is not a constitutional limitation, but, rather, exists as a matter of statutory construction. *Ankenbrandt v. Richards*, —— U.S. ——, ——, 112 S.Ct. 2206, 2207, 119 L.Ed.2d 468 (1992). In *Ankenbrandt*, the Court held that the exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, —— U.S. ——,

——, 112 S.Ct. 2206, 2214, 119 L.Ed.2d 468 (1992). The Supreme Court explained that the dual concerns of judicial economy and judicial expertise drive this exception. *Id. Ankenbrandt* is instructive to the extent that the Supreme Court helped to define the limited boundaries of the domestic relations exception.

It is true that UPRR does not expressly request this Court to issue a divorce, alimony, or child custody decree. Instead, a two-part analysis directs the Court's inquiry. The Court must determine whether a full faith and credit analysis in this state-against-state setting necessarily implicates the Court in *Ankenbrandt*'s variety of domestic relations concerns, which traditionally have been beyond federal jurisdiction and left exclusively for the states to resolve under our federalism-anchored political structure. If the answer to that question is yes, then the Court must next determine whether Congress intended the federal interpleader statute to be an exception to the usual rule that federal courts do not have subject matter jurisdiction over domestic relations disputes.

### B. The Full Faith and Credit Analysis

The Full Faith and Credit Clause of the Constitution directs that "Full Faith and Credit shall be given in each State to Public Acts, Records, and Judicial Proceedings of every other State." U.S. Const. Art. IV, Section 1. The judgments of state courts have the same preclusive effect in the federal courts as they would in the courts of the state in which they were entered. 28 U.S.C. § 1738; *Hooks v. Hooks*, 771 F.2d 935 (6th Cir.1985). "Thus if a State court judgment is subject to collateral attack in the State that rendered it, the judgment might be collaterally attacked in federal court." *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1020 (5th Cir. 1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983).

■ A full faith and credit determination involves another two-step inquiry. First, the Court determines whether the type of judgment in question would have preclusive effect under the law of the state that rendered it. If that question is resolved in the affirmative, the court next considers whether the con-

trary arguments asserted would provide a valid basis for collateral attack in another proceeding in the state that rendered it. *See Hooks v. Hooks*, 771 F.2d at 947.

Here, three state court judgments are at issue: (1) the Louisiana divorce decree of January 26, 1982, which dissolved the marriage between Bolton and Strohmeyer and ordered Bolton to pay child support; (2) the declaratory judgment of the Nebraska court on May 15, 1992, which decreed that Bolton is not the father of the child; and (3) the judgment of the Louisiana court on September 8, 1993, which dismissed Bolton's petition to enforce the Nebraska declaratory judgment and affirmed that under Louisiana law Bolton is the father of the child.

### 1.

The Court begins by inquiring into the preclusive effect of the first Louisiana judgment, which granted Strohmeyer a divorce and ordered Bolton to pay child support. Generally, a divorce decree rendered by a court in a state in which one spouse was domiciled must be given full faith and credit by another state, even if the court rendering the decree did not have jurisdiction over the other spouse. *Williams v. North Carolina*, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942). However, a decree of divorce granted by a court which had no *in personam* jurisdiction over one spouse is not conclusive as to all the accoutrements of marriage. Rather, a court's decree of divorce is separable from its declarations in that decree regarding the incidentals of marriage, including alimony, support, custody, and paternity. *Conlon v. Heckler*, 719 F.2d 788 (5th Cir. 1983).

Thus, this Court's inquiry focuses on the *in personam* jurisdiction of the Louisiana court regarding the divorce decree. If the second forum (Nebraska) determined that the original forum (Louisiana) did not have jurisdiction over the subject matter or the parties, the second forum's finding that the first forum lacked jurisdiction prevails. *Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963).

It is beyond dispute that the Louisiana court had jurisdiction over Bolton when it granted Strohmeyer a divorce and awarded her child support. Because the Louisiana court had *in personam* jurisdiction over Bolton when it rendered judgment, the court's holding as to paternity had preclusive effect under state law. Moreover, when the Nebraska court issued its conflicting ruling, Bolton had no valid basis for collateral attack of the earlier Louisiana judgment. Accordingly, the Nebraska court apparently erred when it failed to give full faith and credit to the Louisiana court's judgment.

This error, however, is mooted by the fact that the Louisiana legislature has since provided Bolton with a facially valid basis for his collateral attack of the first Louisiana court judgment. On May 18, 1993, the Louisiana legislature enacted a disavowal of paternity statute, La.R.S. 9:305, which would seem to give Bolton one hundred eighty days from the effective date of the statute to contest paternity, as he has now done in Louisiana. This statute arguably provides Bolton with a new basis for mounting a collateral attack on the first Louisiana court judgment regarding paternity. In retrospect, therefore, although the full faith and credit clause barred readjudication of the paternity issue by the Nebraska court, that error has been mooted by the fact that the Louisiana legislature has since provided Bolton with a new basis for collateral attack in Louisiana. Because the Louisiana court's judgment on paternity and the like is subject to collateral attack, the Nebraska court's conflicting ruling does not violate the full faith and credit clause.

### 2.

The mere discussion of this analysis and a description of the shape it would take, magnifies the obvious: a federal court is about to become embroiled in an intimate state-driven issue, paternity. Even if the Court is wrong in concluding that the disavowal of paternity statute moots any error by the Nebraska court, the exercise of jurisdiction in this case would violate the domestic relations exception to federal jurisdiction. A recent Supreme Court opinion is helpful on this point. *See Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). In *Thompson*, a California court gave the parents joint child custody. Subse-

quently, however, a Louisiana court awarded sole custody to the mother. Then, the California court awarded sole custody of the child to the father. Before even attempting to enforce the California decree in the Louisiana court, the father filed a suit in federal court in California under the Parental Kidnapping Prevention Act, requesting an order that would declare the Louisiana decree invalid and enjoin its enforcement.

The Supreme Court held that the Act did not create a private federal cause of action. The petitioner contended that interpreting the Act as creating an implied cause of action would not implicate the domestic relations exception to federal jurisdiction because the federal court would merely be applying a full faith and credit analysis to determine which state court had jurisdiction over the dispute. That argument echoes throughout the dispute here. The Court rejected the very same argument. *Id.* at 186, 108 S.Ct. at 519. Jurisdiction under the Act, the Court explained, turns in part on the "best interest" of the child or on proof that the child has been abandoned or abused. *Id.* at 187 n. 4, 108 S.Ct. at 520 n. 4. "Instructing the federal courts to play Solomon where two state courts have issued conflicting custody orders would entangle them in traditional state-law questions that they have little expertise to resolve. This is a cost that Congress made clear it did not want the PKPA to carry." *Id.* at 186–87, 108 S.Ct. at 519–20. Although the doctrinal announcement of *Thompson* differs from what is at work here, the Court's reasoning provides a good theoretical guide. This Court sees the same kind of ill-advised federal court involvement being encouraged now.

The railroad urges that this Court need only determine which state court's judgment deserves full faith and credit. Such a determination, UPRR says, does not implicate the domestic relations exception to federal jurisdiction. The argument is unpersuasive and at odds with what the Court would functionally be asked to do. A full faith and credit analysis requires this Court to consider whether Bolton has a valid basis for collateral attack of the first Louisiana court judgment. That is obvious from the earlier com-

ments. To determine whether Bolton may mount an attack, the Court must determine whether the disavowal of paternity statute applies to Bolton. Such an analysis would clearly compel the Court to determine whether Bolton erroneously believed that he was the father of the child because of the misrepresentation, fraud, or deception of his wife. Answering those questions would inevitably entangle this Court in domestic issues that state courts should and are better suited to resolve.

Because the domestic relations exception to federal diversity jurisdiction is not a constitutional limitation, but, rather, exists as a matter of statutory construction, *Ankenbrandt,* —— U.S. ——, ——, 112 S.Ct. 2206, 2207, 119 L.Ed.2d 468 (1992), the Court must next decide whether Congress intended the interpleader statute to be a saving statute to the domestic relations exception to federal jurisdiction. Again, the Supreme Court's decision in *Thompson* is instructive.

C. *Does the Interpleader Statute Avoid the Domestic Relations Exception?*

1.

The Supreme Court in *Thompson* held that the context, language and history of the act at issue all weighed against inferring a federal cause of action to determine which of two conflicting state custody decrees is valid. The Supreme Court initially noted the context in which the Congress passed the Act. At the time of its passage, custody orders had a peculiar status under the full faith and credit doctrine. The peculiarity stemmed from the fact that custody orders are subject to modification as required by the best interests of the child. *Thompson,* 484 U.S. at 180, 108 S.Ct. at 516 (citations omitted). Consequently, some courts questioned whether custody orders were sufficiently final to trigger full faith and credit dignity. *Id.* (citations omitted). Moreover, even if such orders were subject to the full faith and credit analysis, the Full Faith and Credit Clause only requires states to accord the same force to judgments that would be accorded by the courts of the state in which the judgment was entered. *Id.* That created problems because the courts entering such orders routinely retained power to modify them; and so

courts in neighboring states felt free to change the terms of custody in accordance with the best interests of the child. *Id.* This situation led to an epidemic of parental kidnapping. Unhappy parents tried to take their children to a new jurisdiction to relitigate custody. To deal with this problem, Congress passed the Act to address the inapplicability of full faith and credit requirements to custody determinations. *Id.*

■ The Supreme Court examined the language of the Act, its placement, and its legislative history and concluded that it implied no federal cause of action. In contrast, the federal interpleader statute does create a federal cause of action. That does not mean, however, that UPRR may use the statute to trump the domestic relations exception to federal jurisdiction. The context, language and history of the federal interpleader statute control whether or not Congress intended this statute to be an exception to the general rule that domestic relations questions are left to state courts. That is *Thompson*'s instruction here. *Id.*

### 2.

■ Not surprisingly, nothing in the text, language or history of the federal interpleader statute remotely indicates that Congress intended the interpleader statute to be an exception to the rule that federal courts are not equipped to adjudicate things like divorce, support or paternity. It is a general purpose statute. Congress intended the federal interpleader statute to protect stakeholders from multiple or vexatious litigation. 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1709 (1986). The statute enables disinterested stakeholders to distance themselves from litigation by depositing in a federal court the thing in dispute and having that court direct the parties with interests in the thing to fight it out at their own expense. *Id.* Accordingly, the Court concludes that the federal interpleader statute cannot be used as a back-door way of getting a federal court to resolve paternity and child support issues in order to provide relief to the stakeholder. This Court could not make a full faith and credit determina-

tion without getting into those wholly unique state-sensitive issues.

UPRR argues that it will remain in the crossfire if this Court dismisses its suit. Such an argument has carried little weight with the Supreme Court in the past. In *Thompson*, for example, the Court rejected a similar argument. The reason is rather convincing. The Supreme Court explained that ultimate review remains available for truly intractable jurisdictional deadlocks. But they should be taken through the state justice system first, not the federal system. *See Thompson*, 484 U.S. at 187, 108 S.Ct. at 520.

Accordingly, because the Court does not have subject matter jurisdiction in this case, the railroad's interpleader action is dismissed.