**In re Michael and Nancy BRADSHAW, Debtors.**

**Kim Blandino, Plaintiff,**

v.

**Michael and Nancy Bradshaw, Defendants.**

**Bankruptcy No. BK–S–02–19427.**
**Adversary No. S–02–1457.**

United States Bankruptcy Court, D. Nevada.

April 29, 2004.

878

Kim Blandino, Boulder City, NV, pro se.

Frank J. Sorrentino, Las Vegas, NV, for Defendants.

## MEMORANDUM DECISION

JAMES M. MARLAR, Bankruptcy Judge.

The trial in this adversary proceeding took place on April 19–20, 2004. The plaintiff, Kim Blandino, represented himself. The debtors/defendants, Nancy and Michael Bradshaw, also represented themselves. After consideration of the testimony, exhibits, applicable law, and arguments, the court now rules.[1]

### JURISDICTION

This action was filed to determine the dischargeability of a particular debt pursuant to 11 U.S.C. § 523(a)(6). Additionally, allegations were made that the debtors should be denied their discharge under 11 U.S.C. § 727. This court has exclusive jurisdiction over these core matters. 28 U.S.C. § 157(b)(2)(I), (J), (K); 28 U.S.C. § 1334; 28 U.S.C. § 157(a). Because this court has exclusive core jurisdiction over the matters before it, it proceeded to trial on the merits.[2] The plaintiff also seeks stay relief and injunctive relief.

### ISSUES

1. Whether the debtors have willfully and maliciously injured Kim Blandino, pursuant to 11 U.S.C. § 523(a)(6), such that such debt is non-dischargeable?

2. Whether the debtors should have their discharge denied pursuant to 11 U.S.C. § 727(a)(4)(A)?

3. Whether the automatic stay of 11 U.S.C. § 362(a) should be lifted?

4. Whether the debtors are entitled to the protections and permanent injunction of their bankruptcy discharge, pursuant to 11 U.S.C. § 524.

5. Whether this court should enter injunctive relief and orders in relation to Kim Blandino's visitation rights as to his children, and whether this court has the jurisdiction to do so?

6. Whether this court should quash the *lis pendens* recorded against the debtors' property?

### FACTS

The following narrative represents the court's Findings of Fact. *Bankr.R.* 7052.

### A. Early Background

Debtor, Nancy Bradshaw ("Nancy") and plaintiff, Kim Blandino ("Kim") were "married" in 1987.[3] As a result of this union, two sons were born. Zackary ("Zack") was born May 17, 1988, and Andrew was

---

1. At the inception of the trial proceedings, Blandino orally moved to disqualify the bankruptcy judge. No statutory grounds being shown, pursuant to 28 U.S.C. § 455, the motion was denied in open court.

2. The plaintiff, Kim Blandino, did attempt to have the matter remanded to state court, but because this court has exclusive federal juris-

diction, the court denied that motion on December 8, 2003.

3. In actuality, their marriage was not valid under Nevada law, because the couple failed to procure a marriage license. (Ex. 10, lines 14–19; Ex. 2).

born June 16, 1990. In approximately February 1991, the couple separated. On July 1, 1991, Nancy petitioned the Nevada State Court to award her the primary physical care, custody and control of Zack and Andrew (Ex. 2). Although an order to that effect was not introduced into evidence, there is no dispute that the boys have legally resided and remained with Nancy since that date.

From the time they separated in 1991 until June 6, 1992, Kim and Nancy worked out a periodic visitation schedule (Ex. 1).

### B. The Abduction

However, on June 6, 1992, Kim, without explanation or warning, abducted and kidnapped the two boys (See, Ex. 1). Distraught, Nancy contacted various law enforcement agencies for assistance in locating her children, then ages four and two. She also appeared on television in order to publicize her plight, and pled with the public to assist her in locating her children. Although Kim changed his identity, he was sighted in Portland, and eventually apprehended, with the children, in Phoenix, Arizona, on or about January 25, 1993.

In all, Kim's disappearance, boys in tow, lasted 7-1/2 months. At the time of his arrest, the boys were taken away in a police car and placed in protective custody (Ex. A to Ex. 46). The children's trauma had been exacerbated by Kim telling them "that their mother was dead," and that she had "spiritual cancer." (Ex. A to Ex. 46). During this period, Nancy had no communication whatsoever with either Kim or the boys.

### C. The Interval Between Kim's Apprehension and Prison

Kim was eventually convicted of kidnapping on July 19, 1994, at which time he was immediately sentenced to prison, where he remained until May 27, 1998.

During the interval between his arrest and conviction, beginning May 30, 1993, Kim was allowed some supervised visitation with the boys (See, Ex. C to Ex. 46; Ex. 1). While there was slow progress toward healing made, the supervising caseworker was reluctant to allow more informal visitation, since Kim refused to provide her with any details on where he worked or lived, with whom he associated, or the fundamentals of his beliefs, citing his Fourth Amendment rights (Ex. C to Ex. 46). Thus, because the caseworker "did not know the content or boundaries of his belief system," she kept a tight rein on the supervised visitation during the period between his arrest and incarceration. (See, Ex. C to Ex. 46, covering a period of supervised visitation from August 1993 to January 1994).

### D. Prison

Kim was sentenced to prison, and began serving his term for kidnapping on July 19, 1994.[4] Until his release in May 1998, Kim's contact with his boys was sparse, limited to occasional phone calls, a few letters and one supervised visit before Kim's release (Ex. 1).

Kim was released from custody on May 27, 1998.

### E. Visitation: May 1998–September 2001

Upon his release, court-supervised visitation began again. The Domestic Relations Court appointed Alton J. Cathey, a family therapist, to assist in that regard. The purpose of Mr. Cathey's involvement was to assist in the "reunification" process (Ex. A to Ex. 46). Mr. Cathey met with

---

4. *State of Nevada v. Blandino,* Case No. C 111264.

the parties and the boys from June 1 to July 22, 1998 (Ex. A to Ex. 46). A meeting scheduled for August 19, 1998 was cancelled by Nancy. Ultimately, Mr. Cathey's report concluded that "reunification is not in the best interest of the children at this time," because, although he felt that both parents loved the children, Kim's approach to parenting was unconventional, in that "[h]e conducts his life by the by [sic] his interpretation of the laws of man and God without regard to the expectations of the society in which he lives." (Ex. A to Ex. 46).

Mr. Cathey then resigned from the case.

There was no significant contact between the parties, and no visitation activity of any note, for approximately two years (Ex. 1), until visitation resumed in approximately May, 1999 (Ex. 40).

On August 2, 1999, Kim engaged the services of Dr. Louis F. Mortillaro, Ph.D., to review the history of the case, and especially Mr. Cathey's report (Ex. A to Ex. 46). In an Affidavit dated August 2, 1999, Dr. Mortillaro opined that Mr. Cathey had considered his "personal values" over "rational psychological reasons." (Ex. B to Ex. 46). Dr. Mortillaro endorsed another effort at reunification.

On August 12, 1999, Kim filed an "Emergency Motion for Reunification" attaching the Mortillaro Affidavit and seeking renewed visitation (Ex. 46). A hearing was set for September 9, 1999. Although the court's order was not admitted into evidence, the court apparently agreed with Kim, and appointed Dr. Gary Lenkeit, Ph.D [5] (Ex. 7) to assist in reunification efforts.

The process of interviews and psychological testing then began anew. By Octo-

ber 2, 2000, Dr. Lenheit appeared hopeful that visitation "in a less restrictive environment might, in time, be achieved" (Ex. 7).

From October 2000, through the end of September 2001, matters concerning visitation and counseling were apparently succeeding. Kim's visits with the boys became more regular, and the strictures of the environment loosened from being held entirely at a psychologist's office to being held at parks, bowling alleys, and other normal outside venues.

### F. Disintegration and Meltdown

On approximately August 10, 2001, Nancy revealed to Kim that she intended to relocate to South Carolina, with her family (Ex. 41). Kim was distraught at the idea of having his boys so far away, and on August 12, 2001, wrote Nancy that he also would consider a move to South Carolina (Ex. 12). Both parties recognized that court permission was necessary, and Nancy had filed a Motion with the Family Court on July 17, 2001, seeking permission to relocate (Ex. 12; Ex. 47 at 2, para. 5). By September 5, 2001, Nancy's Motion to Relocate was on file, and Kim wrote to her attorney that he would oppose it (Ex. 13). Apparently, Nancy's decision was causing friction between Kim and Nancy, and Nancy took the "position [that Kim] cannot see the kids unless [Kim] schedule a meeting about moving with Dr. Lenkeit" (Ex. 13). Dr. Lenkeit, by that time, had supervised the visitation and reunification effort for over one year.

During this same period, Kim began proceedings in the family court to recuse certain judges and appoint others. This chain of events paralleled the disintegra-

5. Dr. Lenkeit was eventually rewarded for his having taken this case when he was sued by Kim for "conspiracy" in March 2002 (Ex. 43).

tion period, and led to natural delays due to the administrative problems associated with finding multiple judges for the domestic case (Ex. A to Ex. 17; Ex. B to Ex. 17). By August 30, 2001, the Nevada Supreme Court issued an Administrative Order stating that "all judges with the Family Court division ... have disqualified themselves ...." (Ex. B to Ex. 17). The Nevada Supreme Court then appointed a visiting judge, Judge Papez, from outside the county, to preside over the case (Ex. B to Ex. 17).

Not satisfied with the Supreme Court's choice of judge, Kim filed a motion on September 11, 2001, asking the court to *stay the proceedings* pending his efforts before the Supreme Court to obtain a different judge (Ex. C to Ex. 17).

Thus, by mid-September 2001, Kim had caused all of the Family Court judges in Clark County, Nevada, to universally recuse or be disqualified. At the same time, Nancy was moving ahead on her plan to relocate to South Carolina. She and her new husband, Michael Bradshaw ("Michael")[6] had listed their house for sale, had it in escrow, and were scheduled to close on or about September 21, 2001.

Nancy, Kim and Mike continued to discuss ways of dealing with Kim's visitation rights after the move to South Carolina, but Kim vehemently opposed the move. At a meeting at Nancy's and Michael's home on September 7, 2001, an impasse was reached (Ex. 47, p. 4 at para. 17). During a heated discussion, manipulated by Kim, Kim intentionally crossed the line and began advising Michael about how Michael should raise his own daughters (This from a man who had kidnapped his own children and served four years in prison for such crime). Michael testified that Kim called him a "bad dad," and stated that if Nancy and Mike moved to South Carolina, that "I'll have to take care of your girls for you." Michael, provoked, stated "Don't talk about my daughters or I will kick your ass, mention my daughters again and I will kick your ass." (Ex. 47 at 4, lines 21–24). Kim was then told to leave, and he did. No physical contact of any kind occurred. There was no evidence that Michael made any threatening gesture toward Michael.

During this difficult period, Nancy was pleading for the intervention of Dr. Lenkeit, the court-appointed psychologist.

On September 18, 2001, Kim filed a state court civil action against Nancy and Michael in Clark County, Nevada. The overriding purpose for the litigation was "to re-establish a bonded relationship with ... Zachary and Andrew Blandino." (Ex. 47 at 1, lines 21–24). The essence of the Complaint is found in Count II thereof, wherein Kim contested Nancy's decision to relocate to South Carolina (Ex. 47 at 7–8). Count I of the Complaint details the events leading up to the words Kim had with Michael on September 7, 2001, which Kim contended created a legal cause of action (presumably the tort of assault).

Knowing that the home was in escrow, and set to close on or about September 21, 2001, and knowing further that all of the judges of the Family Court had been disqualified or recused in the domestic case, Kim took a desperate legal step in his plan to prevent Nancy's move. He filed a *lis pendens* against Nancy's and Michael's home (Ex. 48). That singular event thereby caused the sale of the debtors' home to collapse, three days shy of closing. Nancy and Michael had, at that time, leased business property and a personal residence in South Carolina, and had placed deposits thereon. They had given notice at their

6. Nancy and Michael were married August 17, 1997.

jobs. They had also been packing all of their belongings in preparation for the move. Kim's filing of the *lis pendens* created a major disruption to the debtors' plans, and he injured them economically and emotionally in so doing. Now they had before them the task of unwinding their affairs and unpacking. At trial, Kim defiantly maintained his stance that the *lis pendens* was proper (without citing specific authority), and cavalierly maintained that the debtors could have "bonded over" the *lis pendens*. He put on no evidence, however, that Nancy and Michael had the resources to do so. Kim's testimony at trial belies his statement that he thought he was filing the correct legal documents. At trial, Kim stated that he filed the *lis pendens* to "stop the sale" because "the Family Court was not fast enough."

Kim's September 18, 2001, lawsuit did not state a single fact which concerned or related to the land upon which he had placed the *lis pendens*. Nancy and Michael answered the Complaint.

On September 24, 2001, a final meeting was had at the office of Dr. Gary Lenkeit. All parties were present. After discussing the current state of affairs with all parties, Dr. Lenkeit detailed Kim's lack of cooperation, and his creation of the "tremendous conflict" now confronting the parties. He urged the court to continue to supervise visitation, and described Kim's comments at the session to be "particularly disturbing." Dr. Lenkeit noted:

> During our session on September 24, 2001, I found two of Mr. Blandino's statements to be particularly disturbing. He referred to his kidnapping of his children as "seeking self-help." Additionally, he stated that Ms. Bradshaw was the cause of his placement in prison.

Obviously his version of his kidnapping and incarceration is at odds with reality. He appears quite unable to assume responsibility for his behavior.

> During the approximately one year that I have worked on this case progress has been made in the relationship between Mr. Blandino and his children. However, his recent actions have caused a setback in these relationships. Mr. Blandino appears to be placing his perception of his legal rights before the best interests of his children.

(Ex. E. to Ex. 17). Dr. Lenkeit, calling the situation now "intractable," resigned. Importantly, Dr. Lenkeit stated that "Therefore since I will not be available to monitor this situation, *all visitation will need to be suspended at this time.*" (emphasis supplied) (Ex. E. to Ex. 17).[7]

Visitation came to a halt.

On October 1, 2001, Kim filed an "Emergency Motion for Immediate Continuation of Visitation After Disruption by [Debtors]" (Ex. 17). In it, Kim recounted the numerous family court judges who had been assigned to the nine-year proceedings, and on page 6, described his unhappiness with visiting Judge Papez, the judge who had been appointed to preside over the domestic case (Ex. 17 at 6). Kim related, in his motion, that he had filed "a Motion to Stay Proceedings with Judge Papez" (Ex. 17 at 6). Kim was referring to his latest efforts, before the Nevada Supreme Court, to remove Judge Papez and have once-recused Clark County Judge T. Arthur Ritchie again assigned to the case. This proceeding was in the nature of a Mandamus action (See, Ex. D to Ex. 17).

---

7. Although Kim attempted to tie this conclusion to his intransigence in releasing the *lis pendens,* when taken in its complete context, that conclusion is not supported by the evidence.

Because that Mandamus request was pending, the Family Court acted to stay all further proceedings involving the parties' disputes. This order was entered upon *Kim's* request. The decretal portion of the Order stated:

IT IS HEREBY ORDERED that *all proceedings* in this matter are STAYED pending the Nevada Supreme Court's review of Defendant [Kim] Blandino's petition for writ of mandamus.

(Ex. 20)(emphasis supplied).

Although the courts had halted all proceedings and actions in the family court area, either pursuant to Kim's request, or as a natural consequence of Kim's legal maneuvering, Kim nonetheless maintained, in communications with Nancy and others, that everything regarding his visitation rights should be as they were before (See, Ex. 21, letter dated December 17, 2001; Ex. 42, letter dated October 2, 2001; Ex. 23, letter to Las Vegas Police Dept. dated December 25, 2001).

On December 17, 2001, the Nevada Supreme Court granted Kim's Mandamus request, and ordered Judge Ritchie to once more preside over the domestic case (Ex. 22).

### G. The Process Begins Anew

Judge Ritchie heard Kim's motion to restart visitation on February 5, 2002.[8] The court noted that "reunification will be explored," but ordered that there would be a further hearing to determine the conditions of any future visitation (Ex. 26), and continued the hearing to February 11, 2002. The record is clear as to what the judge ordered on that date, February 11, 2002 (See, Ex. 28). He ordered the parties to consult with a court-appointed psy-

chologist named Jo Velasquez, Ph.D (See, Ex. 29). He also ordered that this would be done in order to assist the court "prior to making a judicial decision in this matter" (Ex. 28). The court did *not* make *any* orders regarding visitation, nor did he order the reinstatement of visitation at that time (Ex. 28). The judge also ordered that Kim be responsible for 100% of Dr. Velasquez' costs (Ex. 28). However, Dr. Velasquez declined to accept the case on March 4, 2002 (Ex. 29).

Kim continued his letter-writing campaign to Nancy (See, Ex. 30), and without the benefit of any documentation or experts, advised her that he calculated his "damages" for being unable to see his boys at $5,000 per day (Ex. 30, letter of March 30, 2002).

Nancy, for her part, continued to obey the court orders to suspend visitation. She also ignored Kim's letters.

On May 1, 2002, Judge Ritchie finally entered an Order reinstating Kim's visitation, on a supervised basis, at a locale called "Donna's Place" (Ex. 31). The judge then set a follow-up hearing for June 3, 2002 (Ex. 31).

On May 23, 2002, Donna's House's Executive Director sent an evaluation report to the court. It noted that, among other things, that Kim "has been calling and harassing sta[ff] regarding getting a copy of his court report stating he feels he is entitled to it since he is acting as his own attorney" (Ex. 32).

### H. Visitation Smooths Out

The exhibits received in evidence reflect that after Donna's House began handling the renewed supervised visitation, matters progressed satisfactorily, and contact be-

---

**8.** By this time, Nancy had decided to withdraw her petition to relocate to South Carolina.

tween Kim and his boys improved. Periodically, the court would conduct status hearings, and would receive progress reports from Donna's House (See, Ex. 33, 34, 35, 36). As time went on, the court periodically adjusted and liberalized the visitation schedule (Ex. 33, 35).

Finally, at a hearing on December 2, 2002, the court relaxed the supervised visitation, finally allowing Kim to see the boys on an unsupervised basis. Nonetheless, the court defined the contact and the visitation with clarity and specificity (Ex. 37). Testimony of the parties at this hearing (before the Bankruptcy Court) revealed that Kim and Nancy now attempt to work together to modify the visitation schedule as circumstances dictate. However, periodically, a disruption in visitation flares up, whereupon Kim will quickly voice his legal rights to Nancy, and threaten to take her back to court (see, e.g. the January 4, 2003 incident, Ex. 38, 39).

In general, however, visitation regained a semblance of order, and remains so to the present day (See, Ex. 1, 45). On January 29, 2004, upon Kim's motion, Judge Ritchie granted Kim joint legal custody of Zack and Andrew, provided that the "previous visitation schedules ... ordered by the court shall stand." (Ex. 45).

### I. The Judgment and the Bankruptcy

Lurking in the background, throughout the fall of 2001 and the spring of 2002, was Kim's lawsuit against Nancy and Michael, and its attendant and brooding *lis pendens* (Ex. 47, 48). As noted above, the lawsuit was filed by Kim in reaction to Nancy's decision to relocate to South Carolina, and

the *di minimus* event of Michael's statement which Kim provoked by telling Michael how Michael should parent his own children.

Not one to leave any perceived wrong lying fallow, Kim found a new and additional target, Dr. Gary Lenkeit. On March 25, 2002, Kim amended his state court lawsuit to add Dr. Lenkeit, accusing him of being in some sort of vague conspiratorial relationship with Nancy and Michael to deprive him of his visitation rights.[9]

Kim couched his amended complaint in terms of conspiracy, emotional distress and its intentional infliction. Additionally, Dr. Lenkeit was accused of some ill-defined and unspecific "fraud."

Nancy and Michael failed to answer the Amended Complaint, and Kim entered their default. Kim testified that he then asked the County Clerk to award him a judgment for a higher sum, but that individual in the clerk's office said she only "felt comfortable" entering $50,000. There was no evidence presented to this court that Kim provided any verification for this amount, nor offered any credible evidence or any testimony to the clerk. Thus, on May 8, 2002, Kim had a judgment against Nancy Bradshaw only for $50,000.00 (Ex. 44). The judgment was silent as to Michael, and as to the marital community

On August 16, 2002, Nancy and Michael filed a chapter 7 bankruptcy petition in this court. Among their assets, they listed their home at 4152 Victoria St., with a fair market value of $150,000 and a mortgage lien of $115,285. They claimed a homestead exemption thereon of $34,715.00.[10]

---

**9.** Dr. Lenkeit had been appointed by the court in the family court matter, Kim's dissatisfaction with Dr. Lenkeit should have been voiced in the family court case, not in an independent action. At the trial in this matter, it was revealed that Dr. Lenkeit has been successful

in obtaining dismissal of Kim's lawsuit against him.

**10.** The Nevada homestead, at that time, was $125,000. *Nev.Rev.Stat.* § 21.090(1)(m).

Kim was listed as an unsecured creditor with a $20,000 claim. Total unsecured claims amounted to $81,918.00 (Administrative File).

Other than the instant adversary proceeding, no other creditor has challenged the debtors' bankruptcy, or their right to a discharge.

The trustee has determined that the debtors' case is of the "no asset" variety, and the debtors were granted a discharge on March 9, 2004.

Among the pleadings in both this action and in the administrative case is a Motion for Stay Relief filed by Kim, to allow him to continue to pursue collection of the state court judgment against Nancy. Because of the outcome of this matter, that motion will be DENIED as moot, as the debt represented by the $50,000 judgment is now discharged.[11]

### J. The Non-dischargeability Action

On November 25, 2002, Kim filed this non-dischargeability action, joined with a motion for stay relief, as well as a request for injunctive relief as to his ongoing child visitation rights. An answer was eventually filed on April 18, 2003. A trial on all of these issues was held on April 19–20, 2004.

In a pre-trial motion, Kim had attempted to subpoena Dr. Gary Lenkeit for trial. This court quashed the subpoena, finding Dr. Lenkeit not to be a material witness. Now that trial in this matter has concluded, that opinion was reinforced. Dr. Lenkeit was not present in the Bradshaw home on September 7, 2001, when the alleged offending words were spoken. Moreover, his report of September 25, 2001, contains no actionable conduct on his part. He merely reiterated the outcome of

a joint meeting (held September 24, 2001) and reported his conclusions to the parties as a court-appointed professional. The comments made by him, taken in context, reveal that he was attempting to carry out his assigned duties to the best of his abilities. He thus could present no relevant evidence on either the § 523 or the § 727 issues before this court.

### THE LAW

The following discussion represents this court's conclusions of law as applied to the facts of this case. *Bankr.R.* 9052.

### A. The § 727 claims

 Kim proffered no evidence to support his complaint for denial of the debtors' discharge pursuant to 11 U.S.C. § 727(a)(4)(A), and his contention that the debtors made a "false oath or account." As plaintiff, Kim was required to prove his allegations by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). He failed to meet this burden because he presented absolutely no evidence in support of his § 727 contentions.

Therefore, any and all Counts of the Complaint which seek to have the debtors' discharge denied will be DISMISSED, WITH PREJUDICE.

### B. The Motion for Stay Relief

 Because the plaintiff, as will be discussed below, failed to meet his burden of proof as to the non-dischargeability of his $50,000 judgment debt, no cause exists to lift either the automatic stay of 11 U.S.C. § 362(a), or to otherwise modify the permanent discharge injunction of 11 U.S.C. § 524. This matter was included in the

---

**11.** Because of the granting of the discharge and the judgment herein, Kim is barred by the permanent injunction provisions of 11

U.S.C. § 524 from any further collection or enforcement action thereto.

886

Complaint as Count Seven (there were *two* Count Sevens listed in the Complaint).

Accordingly, an Order will be entered which DENIES the Motion for Stay Relief, WITH PREJUDICE.

### C. Injunctive Relief as to Child Visitation Issues

■ A bankruptcy court is a unit of the United States District Court. As an Article I court, a bankruptcy court has limited jurisdiction. While it may hear and decide core issues, or non-core matters which are related to or arising out of a bankruptcy case, there is no authority for a bankruptcy court to assume control over family issues which are pending in a state court's family law division. As the federal courts have observed since the memory of man runneth not to the contrary, domestic cases are best left to the state courts, *See, Ankenbrandt v. Richards,* 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992); *Peterson v. Babbitt,* 708 F.2d 465 (9th Cir. 1983). This long-established jurisprudence is wisely grounded in the knowledge that the state courts have an established set of procedures, statutes, cases, custom, practice and specialization in handling issues which flow from domestic disharmony. These matters are uniquely matters of state law, with no federal questions presented.

Accordingly, the plaintiff's prayer that this court inject itself into the parties' child visitation issues will be denied, and that Count of the Complaint will be DISMISSED, WITH PREJUDICE.

### D. Willful and Malicious Injury § 523(a)(6)

Kim's complaint for non-dischargeability was brought pursuant to the provisions of 11 U.S.C. § 523(a)(6), which provides that "any debt" for "for willful and malicious injury by the debtor to another entity or the property of another entity" is not entitled to a discharge.

As the United States Supreme Court noted in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), a willful and malicious act under § 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." *Id.* at 977.

■ The Supreme Court noted that a willful injury is one which, in fact, targets a particular individual for harm and in so doing, injures him. The Ninth Circuit Court of Appeals clarified this standard in *In re Su,* 290 F.3d 1140 (9th Cir.2002) when it observed that the "willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." *Id.* The "malicious" prong of § 523(a)(6) has four elements: (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. *Id.* at 1146–47.

In the case at bar, Kim urges the court to grant a judgment on non-dischargeability based upon two independent § 523(a)(6) grounds. The first are Michael's words spoken on September 7, 2001. The second ground is the alleged "denial" of visitation with his children between September 25, 2001 to May 23, 2002.

Each will be discussed in turn.

### a. The Words—an Assault?

■ The only possible, conceivable, traditional tort which might be claimed to have arisen out of Michael's "kick your ass" words of September 7, 2001, is the tort of assault.

■ The tort of assault requires that no physical contact occur. The tort of

"assault" occurs if a person acts with intent to cause another harmful or offensive contact, or another person apprehends imminent contact. *See, Nev.Rev.Stat.* 200.471 (2003); *Garcia v. U.S.,* 826 F.2d 806 (9th Cir.1987); *Anstedt v. State,* 89 Nev. 163, 509 P.2d 968 (1973); *Wilkerson v. State,* 87 Nev. 123, 482 P.2d 314 (1971). Under these cases, mere menace is not enough to establish assault; there must be an effort to carry the intention into execution.

In the case at bar, the court finds and concludes, upon considering all of the evidence, that Michael's "kick your ass" words did not rise to the level of the tort of assault. There was no evidence that Michael made any menacing act or threatening movement toward Kim. There was no evidence that Michael had ever before, or now in the 2–1/2 years since the incident, shown any animus or ill-will toward Kim. As Michael testified, unrebutted by Kim, their attitudes toward one another were and are "civil." The evidence lacked any showing whatsoever of any action, combined with an intent to cause another physical harm, on September 7, 2001, which would create a § 523(a)(6) cause of action. Angry words may have been spoken in a spontaneous moment, but they are not actionable.

Moreover, there was absolutely no credible evidence of any actual damage suffered by Kim. Although Kim caused 48 separate exhibits to be admitted into evidence, not a single one details a penny of money paid by Kim as a result of Michael's September 7, 2001 words. Although Kim referred vaguely to hypertension, there was no link, nexus or proximate tie-in of any kind related to the September 7, 2001, words. There were no medical, doctor or hospital bills shown to the court or offered in evidence.

Therefore, any claim of non-dischargeability pursuant to § 523(a)(6), arising out of the September 7, 2001 words, suffers from an utter and complete lack of evidence as to both the liability or damages associated therewith.

Therefore, Kim's cause of action based on the September 7, 2001, speech incident will be DISMISSED WITH PREJUDICE.

### b. Deprivation of Child Visitation Rights

 Kim alleges that, because he was unable to visit with his boys from approximately September 25, 2001 to May 23, 2002, that this fact translates into a non-dischargeable § 523(a)(6) offense.

 First, the court is of the opinion that this type of emotional injury is not the type of injury contemplated by § 523(a)(6). This type of conduct does *not* "trigger in the lawyer's mind the category of intentional torts ...." *Kawaauhau, supra.* In short, there is no non-dischargeable remedy available for such a grievance.

Second, to the extent a remedy does exist —— and one surely does —— the offending conduct is enforceable in the family courts of the State of Nevada. In this case, the parties have now, and had then (open for many years), an open and pending case file, and visitation orders had been issued by the Nevada Court which could be easily, quickly and inexpensively enforced. The bankruptcy courts have no place in the resolution of family court visitation disputes.

Third, in fact, Kim did take his visitation grievance to family court, and presented all of the same matters to that court as he now presents here. His problem then, however, was that he was "hoist with his

own petard." [12] In other words, Kim had caused his own problems in two ways: (1) by his constant requests for recusal or disqualification of the state court judges assigned to his domestic case, Kim had insured that there was no judge available in family court left to adjudicate his unending controversies, and (2) by filing the frivolous and legally unjustified *lis pendens,* Kim set into motion a series of situational reactions which justifiably ended in numerous types of "stays" designed to keep the eroding status quo from getting worse until a family court judge could be appointed, place the matter back on a docket, and manage a reasonable solution to a situation made chaotic only by Kim's manipulations. This process took the period of September 25, 2001 to May 23, 2002 to stabilize.

During that period, Nancy simply obeyed the court appointed Dr. Lenkeit's instructions to suspend all visitation, and the family court order to stay all proceedings until it could resolve the unsettled judge assignment problem. Once a judge was re-assigned to the case, she followed the court's instructions to the letter.

In other words, Nancy's actions were legally justified, and were not willfully targeted at Kim with the intention to deprive him of visitation.

Fourth, Kim's reliance on his $50,000 default judgment (Ex. 44) to establish his damages may not be collaterally used in this non-dischargeability litigation. There was no competent proof that it was based on anything other than an arbitrary figure conjured up in Kim's mind. No separate evidence was presented to this court by which it could independently assess a damage figure.

Therefore, it is the finding and conclusion of this court that Kim has failed in his

burden to prove a § 523(a)(6) cause of action against Nancy and/or Michael, and that he has failed to prove that he suffered any actual damages.

Accordingly, any and all COUNTS of Kim's Complaint, sounding in § 523(a)(6), are DISMISSED WITH PREJUDICE.

### E. Lis Pendens

█ In connection with his state court lawsuit, Kim also recorded a *lis pendens* against the debtors' real property residence. As noted above, Kim's state court action was wholly unrelated to any claim against the debtors' real property. As such, the *lis pendens* was brought in bad faith, and for an improper motive, viz. to prevent Nancy's move to South Carolina. *Nev.Rev.Stat.* § 14.015(2)(c).

█ It is fundamental to the filing and recordation of a *lis pendens* that the action involve some legal interest in the challenged real property, such as title disputes or lien foreclosures. *See, Nev.Rev. Stat.* § 14.010; *Coury v. Tran,* 111 Nev. 652, 895 P.2d 650 (1995); *Levinson v. Eighth Judicial District Court in and for the County of Clark,* 109 Nev. 747, 857 P.2d 18 (1993). Its purpose is to give constructive notice to purchasers or encumbrancers that a dispute involving title or liens is ongoing. *Nev.Rev.Stat.* § 14.010(3). As noted by the Nevada Supreme Court, a *lis pendens'* purpose is *not* to obtain a type of a pre-judgment attachment which can later be used in the eventual collection of a judgment. *Levinson* at 857 P.2d at 20–21. After explaining why it was an abuse of the *lis pendens* statute to use it frivolously, in non-real property matters, the court concluded:

There must be some claim of entitlement to the real property affected by

---

**12.** Shakespeare, *Hamlet,* Act III, Scene iv, lines 206–07.

the *lis pendens,* a condition wholly absent in the case before us.

857 P.2d at 21. The court also noted:

> As a general proposition, *lis pendens* are not appropriate instruments for use in promoting recoveries in actions for personal or money judgments; rather, their office is to prevent the transfer or loss of real property which is the subject of dispute in the action that provides the basis for the *lis pendens.*

*Levinson* at 20.

Because Kim's state court complaint against Nancy and Mike described a tort, allegedly arising out of the words which Mike spoke on September 7, 2001, and Kim's claims for continued visitation with his children, there was no right for Kim to have filed the *lis pendens.* He wrongfully abused the system in so doing, and its recordation created undue havoc and hardship.

Moreover, in the May 8, 2002, default judgment which Kim received against Nancy only, the only relief granted was a money judgment for $50,000. There was no recognition of any rights to real property.

In view of the debtors' chapter 7 discharge, the recorded *lis pendens* continues to improperly cloud the title to their home. It serves no purpose and does harm daily. Therefore, since the *lis pendens* impairs both the debtors' right to a fresh start and their homestead exemption, this court will enter a judgment which quashes it.[13]

 The court's authority for quashing the *lis pendens* is 11 U.S.C. § 522(f) and 11 U.S.C. § 105(a)(entry of any order which is necessary or appropriate to carry out the provisions of the Bankruptcy Code, and to prevent an abuse of process).

---

13. A *lis pendens* is closely allied to a judicial

## RULING

The plaintiff, Kim Blandino's entire Complaint will be DISMISSED WITH PREJUDICE. A separate judgment will be entered, simultaneously with the entry of this Memorandum Decision, which will be a final judgment on all of the issues delineated by the parties.

It will also be the Order of this Court that plaintiff shall file no post-judgment motions to reconsider, nor motions to alter or amend pursuant to *Bankr.R.* 9023. The plaintiff's sole remedy, should he choose to exercise it, shall be by way of appeal. *Bankr.R.* 8001 *et seq.*

A separate Judgment will be entered. *Bankr.R.* 9021.